# PULLEY, WARDEN v. HARRIS

No. 82–1095.   Argued November 7, 1983—Decided January 23, 1984

38

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in all but Part III of which STEVENS, J., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 54. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 59.

*Michael D. Wellington*, Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van De Kamp*, Attorney General, *Daniel J. Kremer*, Chief Assistant Attorney General, *Steven V. Adler*, Deputy Attorney General, and *Harley D. Mayfield*, Assistant Attorney General.

*Anthony G. Amsterdam* argued the cause for respondent. With him on the brief were *Quin Denvir, Charles M. Sevilla, Ezra Hendon*, and *Michael J. McCabe*.*

JUSTICE WHITE delivered the opinion of the Court.

Respondent Harris was convicted of a capital crime in a California court and was sentenced to death.[1] Along with

---

*\*Charles A. Pulaski, Jr.*, filed a brief for the National Council on Crime and Delinquency as *amicus curiae* urging affirmance.

[1] The evidence at trial established that on July 5, 1978, respondent and his brother decided to steal a getaway car for a bank robbery in Mira Mesa, Cal. Respondent approached two teenaged boys eating hamburgers in their car, and forced them at gunpoint to drive him to a nearby wooded area. His brother followed. They parked the cars, and walked partway up a trail. Respondent told the boys he was going to use their car to rob a bank. They offered to walk to the top of the hill, wait a while, and then

many other challenges to the conviction and sentence, Harris claimed on appeal that the California capital punishment statute was invalid under the United States Constitution because it failed to require the California Supreme Court to compare Harris' sentence with the sentences imposed in similar capital

report the car as stolen, giving misleading descriptions of the thieves. Respondent approved the plan, but when one of the boys moved off into the bushes, he shot the other. He pursued and killed the fleeing boy, then returned and fired several more shots into the body of his first victim. Respondent finished the boys' hamburgers, and he and his brother then went ahead with the bank robbery. They were apprehended soon thereafter and confessed to the killings and the robbery.

A jury convicted respondent of kidnaping, robbery, and the first-degree murder of both boys. In accordance with the California death sentencing scheme then in effect, it also found that the statutory "special circumstances" charged by the prosecution were proved beyond a reasonable doubt: respondent had been convicted of more than one offense of first-degree murder, Cal. Penal Code Ann. § 190.2(c)(5) (West Supp. 1978), and each of the murders was willful, deliberate, premeditated, and committed during the commission of kidnaping and robbery, §§ 190.2(c)(3)(i), (ii). The proper punishment was therefore either death or life imprisonment without the possibility of parole, to be determined at a separate sentencing hearing. At that hearing, the State introduced evidence that respondent had been convicted of manslaughter in 1975; that he had been found in possession of a makeshift knife and a garrote while in prison; that he and others had sodomized another inmate; and that he had threatened that inmate's life. Respondent took the stand and testified to his dismal childhood, his minimal education, and the conviction of his father for sexually molesting respondent's sisters. He stated that his brother had fired the first shots and that he was sorry about the murders. The jury was then provided with a list of factors to help it decide upon a penalty. It chose death. The trial judge denied the automatic motion to modify the judgment. See § 190.4(e).

Respondent was sentenced under the 1977 California death penalty statute, 1977 Cal. Stats., ch. 316, pp. 1255–1266, which was codified at Cal. Penal Code Ann. §§ 190–190.6 (West Supp. 1978). The 1977 statute was replaced in late 1978 by the substantially similar provisions now in effect. See Cal. Pen. Code Ann. §§ 190–190.7 (West Supp. 1983). Unless otherwise noted, references in this opinion are to the 1977 statute. For the most part, however, what is said applies equally to the current California statute.

cases and thereby to determine whether they were proportionate.[2]  Rejecting the constitutional claims by citation to earlier cases, the California Supreme Court affirmed.  *People* v. *Harris*, 28 Cal. 3d 935, 623 P. 2d 240 (1981).[3]  We denied certiorari.  454 U. S. 882 (1981).

Harris then sought a writ of habeas corpus in the state courts.  He again complained of the failure to provide him with comparative proportionality review.  The writ was denied without opinion, and we denied certiorari.  *Harris* v. *California*, 457 U. S. 1111 (1982).  Harris next sought habeas corpus in the United States District Court for the Southern District of California, pressing the claim, among others, that he had been denied the comparative proportionality review assertedly required by the United States Constitution.  The District Court denied the writ and refused to stay Harris' execution, but issued a certificate of probable cause.  The Court of Appeals, after holding that the proportionality review demanded by Harris was constitutionally required, vacated the judgment of the District Court and ordered that the writ issue relieving Harris of the death sentence unless within 120 days the California Supreme Court undertook to determine whether the penalty imposed

---

[2] There has been some confusion as to whether Harris sought proportionality review on direct appeal.  The record filed with us contains a copy of his appellate brief.  The brief is largely identical to his federal habeas petition, which is also in the record, and, from what we can infer, to his state petition, which is not.  In his appellate brief, Harris argued that the California scheme was constitutionally defective for failure to establish a proportionality review mechanism.  His habeas petitions also included an affidavit detailing perceived inconsistencies in California capital sentencing and identifying similar cases in which the death sentence was not imposed. This affidavit was not presented to the California Supreme Court on direct appeal.

[3] Three justices joined the opinion of the court.  Justice Tobriner concurred to note that he considered the death penalty statute unconstitutional but felt bound by a previous ruling from which he had dissented. Chief Justice Bird, joined by Justice Mosk, dissented on the ground that pretrial publicity had denied respondent a fair trial.

on Harris is proportionate to sentences imposed for similar crimes.[4] 692 F. 2d 1189 (1982). We granted the State's petition for certiorari presenting the question whether the proportionality review mandated by the Court of Appeals is required by the United States Constitution. 460 U. S. 1036 (1983).

## I

Harris concedes that the Court of Appeals' judgment rested on a federal constitutional ground. He nonetheless contends that we should affirm the judgment, which has the effect of returning the case to the state courts, because state law may entitle him to the comparative proportionality review that he has unsuccessfully demanded. We are unimpressed with the submission. Under 28 U. S. C. § 2241, a writ of habeas corpus disturbing a state-court judgment may issue only if it is found that a prisoner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U. S. C. § 2241(c)(3). A federal court may not issue the writ on the basis of a perceived error of state law.

Even if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment, Harris' submission is not persuasive. He relies on *People* v. *Frier-*

---

[4] The court rejected Harris' other constitutional challenges to the California statute. First, it found that the list of aggravating and mitigating circumstances adequately limited the jury's discretion, even though the factors were not identified as aggravating or mitigating and even though the jury was allowed to consider nonstatutory factors. Second, it held that there was no constitutional requirement that the appropriateness of the death penalty be established beyond a reasonable doubt. Third, written findings by the jury were not constitutionally required, at least where, as in California, the judge provides such a statement. The court remanded, however, for a possible evidentiary hearing on Harris' claim that the death penalty was being discriminatorily administered in California, and for a closer look at the state-court record to determine whether the California Supreme Court's conclusion that pretrial publicity was not unfairly prejudicial was adequately supported.

*son*, 25 Cal. 3d 142, 599 P. 2d 587 (1979), and *People* v. *Jackson*, 28 Cal. 3d 264, 618 P. 2d 149 (1980), for the proposition that proportionality review should have been extended to him as a matter of state law. But since deciding those cases, the California Supreme Court has twice rejected Harris' demand for proportionality review without suggesting that it was in any way departing from precedent. Indeed, on direct review, it indicated that Harris' constitutional claims had been adversely decided in those very cases.

Finally, if Harris' claim is that because of an evolution of state law he would now enjoy the kind of proportionality review that has so far been denied him, that claim, even if accurate,[5] would not warrant issuing a writ of habeas corpus. Rather it would appear to be a matter that the state courts should consider, if they are so inclined, free of the constraints of the federal writ. Accordingly, we deem it necessary to reach the constitutional question on which certiorari was granted.

## II

At the outset, we should more clearly identify the issue before us. Traditionally, "proportionality" has been used with reference to an abstract evaluation of the appropriateness of

---

[5] None of the California Supreme Court's many reversals in capital cases was based on a finding that the sentence was disproportionate to that imposed on similar defendants for similar crimes. We are aware of only one case beside this one in which the court affirmed a death sentence imposed under the 1977 or later statute. *People* v. *Jackson*, 28 Cal. 3d 264, 618 P. 2d 149 (1980). No proportionality review of the sort at issue here was conducted in that case.

At oral argument, counsel for respondent pointed to *People* v. *Dillon*, 34 Cal. 3d 441, 668 P. 2d 697 (1983), as an example of California's evolving practice of proportionality review. There the court reduced a first-degree murder conviction carrying a life sentence to a second-degree conviction. The court relied in part on the disparity between Dillon's punishment and that received by the six other participants in the crime. *Dillon* was not a death case, did not involve any cross-case comparison, and hardly signifies an established practice of proportionality review.

a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime. . See, *e. g.*, *Solem* v. *Helm*, 463 U. S. 277 (1983); *Enmund* v. *Florida*, 458 U. S. 782 (1982); *Coker* v. *Georgia*, 433 U. S. 584 (1977). The death penalty is not in all cases a disproportionate penalty in this sense. *Gregg* v. *Georgia*, 428 U. S. 153, 187 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.); *id.*, at 226 (WHITE, J., concurring in judgment).

The proportionality review sought by Harris, required by the Court of Appeals,[6] and provided for in numerous state statutes[7] is of a different sort. This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime. The issue in this case, therefore, is whether the Eighth Amendment, applicable to the States through the Fourteenth

---

[6] The Court of Appeals noted a distinction between the proportionality of the death penalty to the crime for which it was imposed, and the proportionality of a given defendant's sentence to other sentences imposed for similar crimes. "This latter proportionality review . . . is what concerns us here." 692 F. 2d 1189, 1196 (1982).

[7] Under the much-copied Georgia scheme, for example, the Supreme Court is required in every case to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ga. Code. Ann. § 17–10–35(c)(3) (1982). If the court affirms the death sentence, it is to include in its decision reference to similar cases that it has taken into consideration. § 17–10–35(e). The court is required to maintain records of all capital felony cases in which the death penalty was imposed since 1970. § 17–10–37(a).

Amendment, requires a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner.   Harris insists that it does and that this is the invariable rule in every case.   Apparently, the Court of Appeals was of the same view.   We do not agree.

## III

Harris' submission is rooted in *Furman* v. *Georgia*, 408 U. S. 238 (1972).   In *Furman*, the Court concluded that capital punishment, as then administered under statutes vesting unguided sentencing discretion in juries and trial judges, had become unconstitutionally cruel and unusual punishment. The death penalty was being imposed so discriminatorily, *id.*, at 240 (Douglas, J., concurring), so wantonly and freakishly, *id.*, at 306 (Stewart, J., concurring), and so infrequently, *id.*, at 310 (WHITE, J., concurring), that any given death sentence was cruel and unusual.   In response to that decision, roughly two-thirds of the States promptly redrafted their capital sentencing statutes in an effort to limit jury discretion and avoid arbitrary and inconsistent results.   All of the new statutes provide for automatic appeal of death sentences. Most, such as Georgia's, require the reviewing court, to some extent at least, to determine whether, considering both the crime and the defendant, the sentence is disproportionate to that imposed in similar cases.   Not every State has adopted such a procedure.   In some States, such as Florida, the appellate court performs proportionality review despite the absence of a statutory requirement; in others, such as California and Texas, it does not.

Four years after *Furman*, this Court examined several of the new state statutes.   We upheld one of each of the three sorts mentioned above.   See *Gregg* v. *Georgia, supra; Proffitt* v. *Florida*, 428 U. S. 242 (1976); *Jurek* v. *Texas*, 428 U. S. 262 (1976).   Needless to say, that some schemes pro-

viding proportionality review are constitutional does not mean that such review is indispensable. We take statutes as we find them. To endorse the statute as a whole is not to say that anything different is unacceptable. As was said in *Gregg*, "[w]e do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis." 428 U. S., at 195 (footnote omitted). Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement.

In *Gregg*, six Justices concluded that the Georgia system adequately directed and limited the jury's discretion. The bifurcated proceedings, the limited number of capital crimes, the requirement that at least one aggravating circumstance be present, and the consideration of mitigating circumstances minimized the risk of wholly arbitrary, capricious, or freakish sentences. In the opinion announcing the judgment of the Court, three Justices concluded that sentencing discretion under the statute was sufficiently controlled by clear and objective standards. *Id.*, at 197–198. In a separate concurrence, three other Justices found sufficient reason to expect that the death penalty would not be imposed so wantonly, freakishly, or infrequently as to be invalid under *Furman*. 428 U. S., at 222.

Both opinions made much of the statutorily required comparative proportionality review. *Id.*, at 198, 204–206, 222–223. This was considered an additional safeguard against arbitrary or capricious sentencing. While the opinion of Justices Stewart, POWELL, and STEVENS suggested that some form of meaningful appellate review is required, *id.*, at 153, 198, 204–206, those Justices did not declare that comparative review was so critical that without it the Georgia statute would not have passed constitutional muster. Indeed, in

summarizing the components of an adequate capital sentencing scheme, Justices Stewart, POWELL, and STEVENS did not mention comparative review:

> "[T]he concerns expressed in *Furman* . . . can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.*, at 195.

In short, the Court of Appeals erred in concluding that *Gregg* required proportionality review.

There is even less basis for reliance on *Proffitt* v. *Florida*, *supra*. The Florida statute provides for a bifurcated procedure and forecloses the death penalty unless the sentencing authority finds that at least one of eight statutory aggravating circumstances is present and is not outweighed by any mitigating circumstances. The joint opinion of Justices Stewart, POWELL, and STEVENS observed that the Florida scheme, like its Georgia counterpart, requires the sentencer to focus on the individual circumstances of each homicide and each defendant. 428 U. S., at 251. Also, by vesting ultimate sentencing authority in the judge rather than the jury, the statute was expected to yield more consistent sentencing at the trial court level. *Id.*, at 252. Only after concluding that trial judges are given specific and detailed guidance to assist them in deciding whether to impose the death penalty did the opinion observe that death sentences are reviewed to ensure that they are consistent with the sentences imposed in similar cases. *Id.*, at 250–251.[8] The opinion concurring in

---

[8] JUSTICE STEVENS implies that the joint opinion in *Proffitt* did not really understand the Florida Supreme Court to conduct comparative proportionality review. *Post*, at 56. While his reading of that opinion does, of course, further support our interpretation of *Proffitt*, we do not share

the judgment filed by three other Justices approved the Florida statute without even mentioning appellate review. *Id.*, at 260–261.

---

it. The opinion stated that the Florida court considered its function to be the same as its "Georgia counterpart," and that it would review a particular sentence " 'in light of the other decisions and determine whether or not the punishment is too great.' " 428 U. S., at 251, quoting *State* v. *Dixon*, 283 So. 2d 1, 10 (Fla. 1973). Thus, sentencing "decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances." 428 U. S., at 253. As JUSTICE STEVENS notes, the opinion went on to point out that the Florida Supreme Court "has several times compared the circumstances of a case under review with those of previous cases in which it has assessed the imposition of death sentences. [Citations omitted.] By following this procedure the Florida court has in effect adopted the type of proportionality review mandated by the Georgia statute." *Id.*, at 259. The most natural reading of this language is that its authors believed that Florida did conduct proportionality review. Indeed, that is how the Florida Supreme Court, for one, has interpreted it. *E. g.*, *McCaskill* v. *State*, 344 So. 2d 1276, 1280 (1977).

While acknowledging that at present the Florida Supreme Court undertakes to provide proportionality review in every case, see *Brown* v. *Wainwright*, 392 So. 2d 1327, cert. denied, 454 U. S. 1000 (1981), JUSTICE STEVENS says that that has not always been its practice, citing a long list of cases in which no such review was explicitly performed. *Post*, at 56–58, n. The Florida Supreme Court has undeniably become more enthusiastic, or at least more explicit, about proportionality review in recent years. See, *e. g.*, *Williams* v. *State*, 437 So. 2d 133 (1983); *Adams* v. *State*, 412 So. 2d 850 (1982). However, comparative proportionality review has been part of at least the theory of appellate review in Florida since the enactment of that State's first post-*Furman* capital punishment statute. It was endorsed in the very first case decided under that statute, see *State* v. *Dixon*, *supra*, at 10, and frequently acknowledged and performed thereafter, see, *e. g.*, *Alvord* v. *State*, 322 So. 2d 533, 540–541 (1975); *Alford* v. *State*, 307 So. 2d 433, 445 (1975); *Lamadline* v. *State*, 303 So. 2d 17, 20 (1974). As the Florida Supreme Court has itself recently stated: "Since the inception of the 'new' death penalty statute in 1972, this Court has engaged in a proportionality review of death cases to ensure rationality and consistency in the imposition of the death penalty." *Sullivan* v. *State*, 441 So. 2d 609, 613 (1983) (citing *State* v. *Dixon*, *supra*).

JUSTICE STEVENS points out that the Florida Supreme Court has not conducted an express review of the proportionality of every capital sentence it has reviewed. It is worth bearing in mind that in many of the

48

That *Gregg* and *Proffitt* did not establish a constitutional requirement of proportionality review is made clearer by *Jurek* v. *Texas*, 428 U. S. 262 (1976), decided the same day. In *Jurek* we upheld a death sentence even though neither the statute, as in Georgia, nor state case law, as in Florida, provided for comparative proportionality review. Justices Stewart, POWELL, and STEVENS, after emphasizing the limits on the jury's discretion,[9] concluded:

> "Texas' capital-sentencing procedures, like those of Georgia and Florida, do not violate the Eighth and Fourteenth Amendments. By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing

decisions he cites the court reversed the death sentence by examining the circumstances of the particular case; proportionality review would therefore have been superfluous. And the fact that in others the court was not explicit about comparative review does not mean none was undertaken. See *Messer* v. *State*, 439 So. 2d 875, 879 (1983) (acknowledging proportionality review requirement, but rejecting "the assertion that in our written opinion we must explicitly compare each death sentence with past capital cases"). In any event, the critical question is what the *Proffitt* Court thought the Florida scheme was. In that regard, the joint opinion speaks for itself.

[9] "Thus, Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it. It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." 428 U. S., at 273–274.

prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution." *Id.*, at 276.

That the three Justices considered such appellate review as Texas provided "a means to promote the evenhanded, rational, and consistent imposition of death sentences," *ibid.*, is revealing. First, it makes plain that, at least in light of the other safeguards in the Texas statute, proportionality review would have been constitutionally superfluous. Second, it suggests that the similarly worded references to appellate review in *Gregg* and *Proffitt* were focused not on proportionality review as such, but only on the provision of some sort of prompt and automatic appellate review. The concurrence expressing the views of three other Justices sustained the Texas statute by focusing solely on the limitations on the jury's discretion, without even mentioning appellate review.[10]

---

[10] "Under the revised law, the substantive crime of murder is defined; and when a murder occurs in one of the five circumstances set out in the statute, the death penalty *must* be imposed if the jury also makes the certain additional findings against the defendant. Petitioner claims that the additional questions upon which the death sentence depends are so vague that in essence the jury possesses standardless sentencing power; but I agree with Justices STEWART, POWELL, and STEVENS that the issues posed in the sentencing proceeding have a common-sense core of meaning and that criminal juries should be capable of understanding them. The statute does not extend to juries discretionary power to dispense mercy, and it should not be assumed that juries will disobey or nullify their instructions. As of February of this year, 33 persons, including petitioner, had been sentenced to death under the Texas murder statute. I cannot conclude at this juncture that the death penalty under this system will be imposed so seldom and arbitrarily as to serve no useful penological function and hence fall within the reach of the decision announced by five Members of the Court in *Furman* v. *Georgia*. . . . [T]he Texas capital punishment statute limits the imposition of the death penalty to a narrowly defined

In view of *Jurek*, we are quite sure that at that juncture the Court had not mandated comparative proportionality review whenever a death sentence was imposed.[11]

Harris also relies on *Zant* v. *Stephens*, 462 U. S. 862 (1983), which was announced after the Court of Appeals' decision in this case. *Zant* did not depart from *Gregg* and did not question *Jurek*. Indeed, *Jurek* was cited in support of the decision. 462 U. S., at 875–876, n. 13. While emphasizing the importance of mandatory appellate review under the Georgia statute, *id.*, at 875 and 876, we did not hold that without comparative proportionality review the statute would be unconstitutional. To the contrary, we relied on the jury's finding of aggravating circumstances, not the State Supreme Court's finding of proportionality, as rationalizing the sentence.[12] Thus, the emphasis was on the constitutionally necessary narrowing function of statutory aggravating circumstances. Proportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required.

There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the

---

group of the most brutal crimes and aims at limiting its imposition to similar offenses occurring under similar circumstances." *Id.*, at 278–279 (WHITE, J., joined by BURGER, C. J., and REHNQUIST, J., concurring in judgment).

[11] See also *Woodson* v. *North Carolina*, 428 U. S. 280, 319 (1976) (REHNQUIST, J., dissenting) ("If the States wish to undertake such an effort [*i. e.*, proportionality review], they are undoubtedly free to do so, but surely it is not required by the United States Constitution").

[12] We upheld the death sentence even though the State Supreme Court had invalidated, as unconstitutionally vague, one of the three aggravating circumstances relied on by the jury. The two remaining circumstances "adequately differentiate[d] this case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed." 462 U. S., at 879.

defendant requests it. Indeed, to so hold would effectively overrule *Jurek* and would substantially depart from the sense of *Gregg* and *Proffitt*. We are not persuaded that the Eighth Amendment requires us to take that course.

## IV

Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977 California statute is not of that sort. Under this scheme, a person convicted of first-degree murder is sentenced to life imprisonment unless one or more "special circumstances" are found, in which case the punishment is either death or life imprisonment without parole. Cal. Penal Code Ann. §§ 190, 190.2 (West Supp. 1978).[13] Special circumstances are alleged in the charging paper and tried with the issue of guilt at the initial phase of the trial. At the close of evidence, the jury decides guilt or innocence and determines whether the special circumstances alleged are present. Each special circumstance must be proved beyond a reasonable doubt. § 190.4(a). If the jury finds the defendant guilty of first-degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors.

---

[13] Briefly, the statutory special circumstances are: (1) the murder was for profit; (2) the murder was perpetrated by an explosive; (3) the victim was a police officer killed in the line of duty; (4) the victim was a witness to a crime, killed to prevent his testifying in a criminal proceeding; (5) the murder was committed during the commission of robbery, kidnaping, rape, performance of a lewd or lascivious act on someone under 14, or burglary; (6) the murder involved torture; (7) the defendant had been previously convicted of first- or second-degree murder, or was convicted of more than one murder in the first or second degree in the instant proceeding. Cal. Penal Code Ann. § 190.2 (West Supp. 1978). These are greatly expanded in the current statute. See Cal. Penal Code Ann. §190.2 (West Supp. 1983).

§ 190.3.[14]   "After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole." *Ibid.*   If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict.   § 190.4(e).   The trial judge then reviews the evidence and, in light of the statutory factors, makes an "independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." *Ibid.*   The judge is required to state on the record the reasons for his findings.

---

[14] The statute does not separate aggravating and mitigating circumstances.   Section 190.3 provides:

"In determining the penalty the trier of fact shall take into account any of the following factors if relevant:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to § 190.1.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication.

"(h) The age of the defendant at the time of the crime.

"(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

*Ibid.* If the trial judge denies the motion for modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute does not require comparative proportionality review or otherwise describe the nature of the appeal.[15] It does state that the trial judge's refusal to modify the sentence "shall be reviewed." § 190.4(e). This would seem to include review of the evidence relied on by the judge. As the California Supreme Court has said, "the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case." *People* v. *Frierson,* 25 Cal. 3d, at 179, 599 P. 2d, at 609. That court has reduced a death sentence to life imprisonment because the evidence did not support the findings of special circumstances. *People* v. *Thompson,* 27 Cal. 3d 303, 611 P. 2d 883 (1980).

By requiring the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small subclass of capital-eligible cases. The statutory list of relevant factors, applied to defendants within this subclass, "provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty," 692 F. 2d, at 1194, "guarantee[ing] that the jury's discretion will be guided and its consideration deliberate," *id.,* at 1195. The jury's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* 428 U. S., at 189. Its decision is reviewed by the trial judge and the State Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman* and our subsequent cases.

---

[15] The provision for automatic appeal in the Texas statute considered in *Jurek* was similarly silent as to the exact nature of the appeal. 428 U. S., at 269.

Any capital sentencing scheme may occasionally produce aberrational outcomes. Such inconsistencies are a far cry from the major systemic defects identified in *Furman.* As we have acknowledged in the past, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant* v. *Stephens,* 462 U. S., at 884, quoting *Lockett* v. *Ohio,* 438 U. S. 586, 605 (1978) (plurality opinion). As we are presently informed, we cannot say that the California procedures provided Harris inadequate protection against the evil identified in *Furman.* The Court of Appeals therefore erred in ordering the writ of habeas corpus to issue. Its judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

While I agree with the basic conclusion of Part III of the Court's opinion—our case law does not establish a constitutional requirement that comparative proportionality review be conducted by an appellate court in every case in which the death penalty is imposed—my understanding of our decisions in *Gregg* v. *Georgia,* 428 U. S. 153 (1976); *Proffitt* v. *Florida,* 428 U. S. 242 (1976); *Jurek* v. *Texas,* 428 U. S. 262 (1976); and *Zant* v. *Stephens,* 462 U. S. 862 (1983), is sufficiently different from that reflected in Part III to prevent me from joining that portion of the opinion.

While the cases relied upon by respondent do not establish that comparative proportionality review is a constitutionally required element of a capital sentencing system, I believe the case law does establish that appellate review plays an essential role in eliminating the systemic arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman* v. *Georgia,* 408 U. S. 238 (1972), and hence that some form of meaningful appellate review is constitutionally required.

The systemic arbitrariness and capriciousness in the imposition of capital punishment under statutory schemes invalidated by *Furman* resulted from two basic defects in those schemes. First, the systems were permitting the imposition of capital punishment in broad classes of offenses for which the penalty would always constitute cruel and unusual punishment. Second, even among those types of homicides for which the death penalty could be constitutionally imposed as punishment, the schemes vested essentially unfettered discretion in juries and trial judges to impose the death sentence. Given these defects, arbitrariness and capriciousness in the imposition of the punishment were inevitable, and given the extreme nature of the punishment, constitutionally intolerable. The statutes we have approved in *Gregg*, *Proffitt*, and *Jurek* were designed to eliminate each of these defects. Each scheme provided an effective mechanism for categorically narrowing the class of offenses for which the death penalty could be imposed and provided special procedural safeguards including appellate review of the sentencing authority's decision to impose the death penalty.

In *Gregg*, the opinion of Justices Stewart, POWELL, and STEVENS indicated that some form of meaningful appellate review is required, see 428 U. S., at 198, and that opinion, *id.*, at 204–206, as well as JUSTICE WHITE's opinion, see *id.*, at 224, focused on the proportionality review component of the Georgia statute because it was a prominent, innovative, and noteworthy feature that had been specifically designed to combat effectively the systemic problems in capital sentencing which had invalidated the prior Georgia capital sentencing scheme. But observations that this innovation is an effective safeguard do not mean that it is the only method of ensuring that death sentences are not imposed capriciously or that it is the only acceptable form of appellate review.

In *Proffitt*, the joint opinion of Justices Stewart, POWELL, and STEVENS explicitly recognized that the Florida "law differs from that of Georgia in that it does not require the court to conduct any specific form of review." 428 U. S., at

250–251. The opinion observed, however, that "meaningful appellate review" was made possible by the requirement that the trial judge justify the imposition of a death sentence with written findings, and further observed that the Supreme Court of Florida had indicated that death sentences would be reviewed to ensure that they are consistent with the sentences imposed in similar cases. *Id.*, at 251. Under the Florida practice as described in the *Proffitt* opinion, the appellate review routinely involved an independent analysis of the aggravating and mitigating circumstances in the particular case. *Id.*, at 253. Later in the opinion, in response to Proffitt's argument that the Florida appellate review process was "subjective and unpredictable," *id.*, at 258, we noted that the State Supreme Court had "several times" compared the circumstances of a case under review with those of previous cases in which the death sentence had been imposed and that by "following this procedure the Florida court has in effect adopted the type of proportionality review mandated by the Georgia statute." *Id.*, at 259. We did not, however, indicate that the particular procedure that had been followed "several times" was either the invariable routine in Florida,* or that it was an indispensable feature of meaningful appellate review.

---

*And, of course, it was not the regular practice in Florida before *Proffitt* was decided. Proportionality review was not conducted in the following pre-*Proffitt* decisions: *Jones* v. *State*, 332 So. 2d 615, 619 (1976) *(per curiam)* (reversing death sentence as unwarranted under circumstances of particular case); *Henry* v. *State*, 328 So. 2d 430, 432 *(per curiam)* (affirming death sentence weighing circumstances in case before it), cert. denied, 429 U. S. 951 (1976); *Douglas* v. *State*, 328 So. 2d 18, 21–22 (same), cert. denied, 429 U. S. 871 (1976); *Thompson* v. *State*, 328 So. 2d 1, 5 (1976) (quotes language from *State* v. *Dixon*, 283 So. 2d 1 (Fla. 1973), concerning review in light of prior decisions, then reverses death sentence without considering other cases but instead based on facts in case before it); 328 So. 2d, at 5–6 (Adkins, J., concurring specially) (maintaining affirmance was merited based on his agreement with weighing of circumstances performed by trial judge); *Dobbert* v. *State*, 328 So. 2d 433, 441 (1976) (affirming death

The Texas statute reviewed in *Jurek*, like the Florida statute reviewed in *Proffitt*, did not provide for comparative review. We nevertheless concluded "that Texas' capital-

sentence without cross-case proportionality review, but opinion did agree with trial judge's general remark that the crime was the most atrocious of which he had personal knowledge), aff'd, 432 U. S. 282 (1977); *Halliwell* v. *State*, 323 So. 2d 557, 561 (1975) *(per curiam)* (reversing death sentence based on weighing of circumstances in particular case); *Tedder* v. *State*, 322 So. 2d 908, 910 (1975) (establishing special standard of review in reviewing imposition of death sentence after jury recommendation of life sentence, and reversing death sentence under circumstances of particular case); *Swan* v. *State*, 322 So. 2d 485, 489 (1975) (same); *Gardner* v. *State*, 313 So. 2d 675, 677 (1975) (affirming death sentence based on weighing circumstances in case before it), cert. denied, 430 U. S. 349 (1977); *Spinkellink* v. *State*, 313 So. 2d 666, 671 (1975) (same), cert. denied, 428 U. S. 911 (1976); *Sawyer* v. *State*, 313 So. 2d 680, 682 (1975) (same), cert. denied, 428 U. S. 911 (1976); *Hallman* v. *State*, 305 So. 2d 180, 182 (1974) *(per curiam)* (same), cert. denied, 428 U. S. 911 (1976); *Sullivan* v. *State*, 303 So. 2d 632, 637–638 (1974) (specially concurring opinion joined by five justices citing *Dixon* for proposition that court's responsibility is to independently determine whether death penalty warranted and proceeds to affirm the death sentence based on assessment of circumstances in case before it), cert. denied, 428 U. S. 911 (1976); *Taylor* v. *State*, 294 So. 2d 648, 652 (1974) (reversing death sentence based on weighing of circumstances in particular case). Moreover, opinions issued shortly before and after *Proffitt* reveal a similar absence of comparative proportionality review. *Adams* v. *State*, 341 So. 2d 765, 769 (1976) (affirming death sentence and citing *Dixon* for proposition that role of court is to independently review circumstances in particular case and determine whether death sentence warranted), cert. denied, 434 U. S. 977 (1977); *Funchess* v. *State*, 341 So. 2d 762, 763 (1976) (affirming death sentence weighing circumstances in case before it), cert. denied, 434 U. S. 878 (1977); *Chambers* v. *State*, 339 So. 2d 204 (1976) *(per curiam)* (reversing death sentence based on circumstances of case before it); *Meeks* v. *State*, 339 So. 2d 186, 192 (1976) *(per curiam)* (affirming death sentence, compares sentence with that of accomplice only, affirms on ground that sentence warranted under circumstances of particular case), cert. denied, 439 U. S. 991 (1978); *Knight* v. *State*, 338 So. 2d. 201, 205 (1976) (affirming death sentence weighing circumstances in case before it); *Meeks* v. *State*, 336 So. 2d 1142, 1145 (1976) (same); see also *Cooper* v. *State*, 336 So. 2d 1133, 1142 (1976), cert. denied, 431 U. S. 925 (1977).

sentencing procedures, like those of Georgia and Florida," were constitutional because they assured that "sentences of death will not be 'wantonly' or 'freakishly' imposed." 428 U. S., at 276. That assurance rested in part on the statutory guarantee of meaningful appellate review. As we stated:

> "By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Ibid.*

Thus, in all three cases decided on the same day, we relied in part on the guarantee of meaningful appellate review, and we found no reason to differentiate among the three statutes in appraising the quality of the review that was mandated.

Last Term in *Zant* v. *Stephens*, 462 U. S. 862 (1983), we again reviewed the Georgia sentencing scheme. The Court observed that the appellate review of every death penalty proceeding "to determine whether the sentence was arbitrary or disproportionate" was one of the two primary features upon which the *Gregg* joint opinion's approval of the Georgia scheme rested. 462 U. S., at 876. While the Court did not focus on the comparative review element of the scheme in reaffirming the constitutionality of the Georgia statute, appellate review of the sentencing decision was deemed essential to upholding its constitutionality. *Id.*, at 876–877, and n. 15. The fact that the Georgia Supreme Court had reviewed the sentence in question "to determine whether it was arbitrary, excessive, or disproportionate"

---

The Florida Supreme Court now undertakes to provide proportionality review in every case, see *Brown* v. *Wainwright*, 392 So. 2d 1327, 1331, cert. denied, 454 U. S. 1000 (1981). As we noted in *Proffitt*, this practice does provide the "function of death sentence review with a maximum of rationality and consistency." 428 U. S., at 258–259. The fact that the practice is an especially good one, however, does not mean that it is an indispensable element of meaningful appellate review.

was relied upon to reject a contention that the statute was invalid as applied because of the absence of standards to guide the jury in weighing the significance of aggravating circumstances, *id.*, at 879–880 (footnote describing proportionality review omitted), and the mandatory appellate review was also relied upon in rejecting the argument that the subsequent invalidation of one of the aggravating circumstances found by the jury required setting aside the death sentence, *id.*, at 890. Once again, proportionality review was viewed as an effective, additional safeguard against arbitrary and capricious death sentences. While we did not hold that comparative proportionality review is a mandated component of a constitutionally acceptable capital sentencing system, our decision certainly recognized what was plain from *Gregg*, *Proffitt*, and *Jurek:* that some form of meaningful appellate review is an essential safeguard against the arbitrary and capricious imposition of death sentences by individual juries and judges.

To summarize, in each of the statutory schemes approved in our prior cases, as in the scheme we review today, meaningful appellate review is an indispensable component of the Court's determination that the State's capital sentencing procedure is valid. Like the Court, however, I am not persuaded that the particular form of review prescribed by statute in Georgia—comparative proportionality review—is the only method by which an appellate court can avoid the danger that the imposition of the death sentence in a particular case, or a particular class of cases, will be so extraordinary as to violate the Eighth Amendment.

Accordingly, I join in all but Part III of the Court's opinion and concur in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Almost 12 years ago, in *Furman* v. *Georgia*, 408 U. S. 238 (1972), the Court concluded that the death penalty, as then administered under various state and federal statutes, con-

stituted a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. At that time, the Court was convinced that death sentences were being imposed in a manner that was so arbitrary and capricious that no individual death sentence could be constitutionally justified.[1] Four years later, faced with new death penalty statutes enacted by the States of Georgia, Florida, and Texas, a majority of the Court concluded that the procedural mechanisms included in those statutes provided sufficient protection to ensure their constitutional application. See *Gregg* v. *Georgia*, 428 U. S. 153 (1976); *Proffitt* v. *Florida*, 428 U. S. 242 (1976); *Jurek* v. *Texas*, 428 U. S. 262 (1976). Thus began a series of decisions from this Court in which, with some exceptions, it has been assumed that the death penalty is being imposed by the various States in a rational and nondiscriminatory way. Upon the available evidence, however, I am convinced that the Court is simply deluding itself, and also the American public, when it insists that those defendants who have already been executed or are today condemned to death have been selected on a basis that is neither arbitrary nor capricious, under any meaningful definition of those terms.

Moreover, in this case, the Court concludes that proportionality review of a death sentence is constitutionally unnecessary. Presumably this is so, even if a comparative review of death sentences imposed on similarly situated defendants might eliminate some, if only a small part, of the irrationality

---

[1] In a concurring opinion, I expressed the view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. *Furman* v. *Georgia*, 408 U. S., at 257. See also *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting). Nothing that has occurred during the past 12 years has given me any reason to change these views; if anything, I am today more persuaded of the unconstitutionality of the death penalty than ever before. I therefore adhere to the views I expressed in *Furman* and *Gregg*, and would vacate the death sentence imposed on the respondent, Robert Alton Harris.

that currently surrounds the imposition of the death penalty. Because, in my view, the evidence available to the Court suggests that proportionality review does serve this limited purpose, I believe that the State of California, through a court of statewide jurisdiction, should be required to undertake proportionality review when examining any death sentence on appeal.

## I

## A

In *Furman* v. *Georgia, supra,* and subsequent orders, see, *e. g.,* 408 U. S. 933–940 (1972), the Court invalidated all death sentences then existing in the various States. Although each of the five Justices concurring in the *per curiam* opinion of the Court authored a separate opinion, it has since been the accepted holding of *Furman* that, at a minimum, the death penalty cannot "be imposed under sentencing procedures that creat[e] a substantial risk that it [will] be inflicted in an arbitrary and capricious manner." *Gregg* v. *Georgia, supra,* at 188 (opinion of Stewart, POWELL, and STEVENS, JJ.).

This was the touchstone of Justice Stewart's concerns in *Furman:*

> "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders . . . , many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so

wantonly and so freakishly imposed." 408 U. S., at 309–310 (footnotes and citations omitted).

Likewise, JUSTICE WHITE concluded that "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.*, at 313. And, although focusing his analysis on the equal protection concerns of the Eighth Amendment, Justice Douglas substantially agreed, noting that "[t]he high service rendered by the 'cruel and unusual' punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." *Id.*, at 256. See also *id.*, at 248, n. 11, 249 (Douglas, J., concurring) ("'A penalty . . . should be considered "unusually" imposed if it is administered arbitrarily or discriminatorily'") (quoting Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773, 1790 (1970)); 408 U. S., at 274–277, 291–295 (BRENNAN, J., concurring).[2]

These concerns about the irrational imposition of the death penalty were not based on abstract speculation. Rather, they were premised on actual experience with the administration of the penalty by the various States. I will not attempt at this time to summarize the evidence available to the Court in 1972 when *Furman* was decided. See, *e. g.*, *id.*, at 249–252, 256–257, n. 21 (Douglas, J., concurring); *id.*, at 291–295 (BRENNAN, J., concurring); *id.*, at 309–310 (Stewart,

---

[2] Even the dissenters viewed the concerns expressed about the arbitrary and capricious infliction of the death penalty as the primary basis for the Court's decision: "The decisive grievance of the opinions . . . is that the present system of discretionary sentencing in capital cases has failed to produce evenhanded justice; . . . that the selection process has followed no rational pattern." 408 U. S., at 398–399 (BURGER, C. J., dissenting).

J., concurring); *id.*, at 364–369 (MARSHALL, J., concurring). Suffice it to say that the Court was persuaded, both from personal experience in reviewing capital cases[3] and from the available research analyzing imposition of this extreme penalty, that the death penalty was being administered in an arbitrary and capricious manner.

Moreover, this stated concern with the irrational imposition of the death penalty did not cease with the judgments of the *Furman* Court; indeed, the same focus has been reflected in the Court's decisions ever since. See, *e. g.*, *Barclay* v. *Florida*, 463 U. S. 939, 958–960 (1983) (STEVENS, J., concurring in judgment); *Zant* v. *Stephens*, 462 U. S. 862, 874 (1983) (characterizing *Furman* as holding that "'where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action'") (quoting *Gregg* v. *Georgia*, 428 U. S., at 189 (opinion of Stewart, POWELL, and STEVENS, JJ.)); *Eddings* v. *Oklahoma*, 455 U. S. 104, 111 (1982) (noting that the Court "has attempted to provide standards for a constitutional death penalty that would serve both goals of measured, consistent application and fairness to the accused"); *id.*, at 112 (noting that the Court has "insiste[d] that capital punishment be imposed fairly, and with reasonable consistency, or not at all"). Hence, if any principle is an accepted part of the Court's death penalty decisions during the past 12 years, it is that the irrational application of the death penalty, as evidenced by an

---

[3] In his concurring opinion, JUSTICE WHITE focused on his personal experience: "I need not restate the facts and figures that appear in the opinions of my Brethren. Nor can I 'prove' my conclusion from these data. But, like my Brethren, I must arrive at judgment; and I can do no more than state a conclusion based on 10 years of almost daily exposure to the facts and circumstances of hundreds and hundreds of federal and state criminal cases involving crimes for which death is the authorized penalty." *Id.*, at 313.

examination of when the death penalty is actually imposed, cannot be constitutionally defended.

Even while repeating this principle, however, the Court since *Gregg* v. *Georgia, supra,* and its companion cases, has allowed executions to take place, and death rows to expand, without fully examining the results obtained by the death penalty statutes enacted in response to the *Furman* decision. Indeed, the Court seems content to conclude that, so long as certain procedural protections exist, imposition of the death penalty is constitutionally permissible. But a sentencer's consideration of aggravating and mitigating circumstances, see *ante,* at 51–53, combined with some form of meaningful appellate review, see *ante,* at 54–55, 59 (STEVENS, J., concurring in part), does not by itself ensure that a death sentence in any particular case, or the death penalty in general, is a constitutional exercise of the State's power. Given the emotions generated by capital crimes, it may well be that juries, trial judges, and appellate courts considering sentences of death are invariably affected by impermissible considerations. Although we may tolerate such irrationality in other sentencing contexts, the premise of *Furman* was that such arbitrary and capricious decisionmaking is simply invalid when applied to "'a matter [as] grave as the determination of whether a human life should be taken or spared.'" *Zant* v. *Stephens, supra,* at 874. As executions occur with more frequency, therefore, the time is fast approaching for the Court to reexamine the death penalty, not simply to ensure the existence of adequate procedural protections, but more importantly to reevaluate the imposition of the death penalty for the irrationality prohibited by our decision in *Furman.*

### B

The current evidence of discriminatory and irrational application of the death penalty has yet to be completely or systematically marshaled. What evidence has been compiled, moreover, has not been properly presented to the Court and

is not at issue in this case. Nevertheless, as in other recent decisions, the Court today evaluates the procedural mechanism at issue—in this case, comparative proportionality review—without regard to whether the actual administration of the death penalty by the States satisfies the concerns expressed in *Furman*.

The most compelling evidence that the death penalty continues to be administered unconstitutionally relates to the racial discrimination that apparently, and perhaps invariably, exists in its application. The Court correctly avoids the question of racial discrimination as not properly presented in this case. See *ante*, at 41, n. 4 (noting that the Court of Appeals "remanded . . . for a possible evidentiary hearing on Harris' claim that the death penalty was being discriminatorily administered in California").[4] But the issue cannot be avoided much longer, as decisions of the lower federal courts are beginning to recognize. See, *e. g.*, *Spencer* v. *Zant*, 715 F. 2d 1562, 1578–1583 (CA11 1983), rehearing en banc pending, No. 82–8408; *Ross* v. *Hopper*, 716 F. 2d 1528, 1539 (CA11 1983). See also *Stephens* v. *Kemp*, 464 U. S. 1027 (1983) (stay of execution granted pending rehearing en banc in *Spencer*).

Furthermore, the scholarly research necessary to support a claim of systemic racial discrimination is currently being pursued, and the results of that research are being compiled into a rapidly expanding body of literature. See, *e. g.*,

---

[4] The Court of Appeals held, in a portion of its opinion not challenged before this Court, that "the district court should, if it becomes necessary, provide an opportunity to develop the factual basis and arguments concerning [Harris'] race-discrimination and gender-discrimination claims." 692 F. 2d 1189, 1197–1199 (CA9 1982). Harris is therefore entitled on remand to develop the evidence and arguments essential to an adequate review of these claims. At the same time, Harris made no showing in support of his wealth and age discrimination claims; the Court of Appeals therefore refused to require an evidentiary hearing or further consideration of these alleged bases for discrimination. *Id.*, at 1199.

D. Baldus, G. Woodworth, & C. Pulaski, The Differential Treatment of White and Black Victim Homicide Cases in Georgia's Capital Charging and Sentencing Process: Preliminary Findings (June 1982) (unpublished), reprinted in App. G to Pet. for Cert. in *Smith* v. *Balkcom*, O. T. 1981, No. 6978, Exh. E, Appendix D (discrimination by race of victim); Bowers & Pierce, Arbitrariness and Discrimination under Post-*Furman* Capital Statutes, 26 Crime & Delinquency 563 (1980) (discrimination by race of defendant and race of victim); L. Foley, Florida After the Furman Decision: Discrimination in the Processing of Capital Offense Cases (unpublished), reprinted in App. to Application for Stay in *Sullivan* v. *Wainwright*, O. T. 1983, No. A–409, Exh. 33 (discrimination by race of victim); Foley & Powell, The Discretion of Prosecutors, Judges, and Juries in Capital Cases, 7 Crim. Just. Rev. 16 (Fall 1982) (discrimination by race of victim); S. Gross & R. Mauro, Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization (Oct. 1983) (unpublished), reprinted in App. to Application for Stay in *Sullivan* v. *Wainwright, supra,* Exh. 28 (discrimination by race of victim); Jacoby & Paternoster, Sentencing Disparity and Jury Packing: Further Challenges to the Death Penalty, 73 J. Crim. L. & Criminology 379 (1982) (discrimination by race of victim); Kleck, Racial Discrimination in Criminal Sentencing: A Critical Evaluation of the Evidence with Additional Evidence on the Death Penalty, 46 Am. Soc. Rev. 783 (1981); Radelet, Racial Characteristics and the Imposition of the Death Penalty, 46 Am. Soc. Rev. 918 (1981) (discrimination by race of victim); M. Radelet & G. Pierce, Race and Prosecutorial Discretion in Homicide Cases (1983) (presented at the Meetings of the American Sociological Association, Detroit, Mich., Sept. 4, 1983), reprinted in App. to Application for Stay in *Sullivan* v. *Wainwright, supra,* Exh. 34 (discrimination by race of defendant and race of victim); Riedel, Discrimination in the Imposition of the Death Penalty: A Comparison of the

Characteristics of Offenders Sentenced Pre-*Furman* and Post-*Furman*, 49 Temp. L. Q. 261 (1976); Zeisel, Race Bias in the Administration of the Death Penalty: The Florida Experience, 95 Harv. L. Rev. 456 (1981) (discrimination by race of defendant and race of victim). See also C. Black, Capital Punishment: The Inevitability of Caprice and Mistake (2d ed. 1981). Although research methods and techniques often differ, the conclusions being reached are relatively clear: factors crucial, yet without doubt impermissibly applied, to the imposition of the death penalty are the race of the defendant and the race of the victim.

Nor do I mean to suggest that racial discrimination is the only irrationality that infects the death penalty as it is currently being applied. Several of the studies cited above suggest that discrimination by gender, *e. g.*, Foley, *supra;* Foley & Powell, *supra,* by socioeconomic status, *e. g.*, Foley & Powell, *supra,* and by geographical location within a State, *e. g.*, Bowers & Pierce, *supra;* Foley & Powell, *supra,* may be common. I will not attempt at this time to expand upon the conclusions that these studies may dictate. But if the Court is going to fulfill its constitutional responsibilities, then it cannot sanction continued executions on the unexamined assumption that the death penalty is being administered in a rational, nonarbitrary, and noncapricious manner. Simply to assume that the procedural protections mandated by this Court's prior decisions eliminate the irrationality underlying application of the death penalty is to ignore the holding of *Furman* and whatever constitutional difficulties may be inherent in each State's death penalty system.

## II

The question directly presented by this case is whether the Federal Constitution requires a court of statewide jurisdiction to undertake comparative proportionality review before a death sentence may be carried out. The results obtained by many States that undertake such proportionality review,

pursuant to either state statute or judicial decision, convince me that this form of appellate review serves to eliminate some, if only a small part, of the irrationality that infects the current imposition of death sentences throughout the various States. To this extent, I believe that comparative proportionality review is mandated by the Constitution.

## A

Some forms of irrationality that infect the administration of the death penalty—unlike discrimination by race, gender, socioeconomic status, or geographic location within a State—cannot be measured in any comprehensive way. That does not mean, however, that the process under which death sentences are currently being imposed is otherwise rational or acceptable. Rather, for any individual defendant the process is filled with so much unpredictability that "it smacks of little more than a lottery system," *Furman* v. *Georgia*, 408 U. S., at 293 (BRENNAN, J., concurring), under which being chosen for a death sentence remains as random as "being struck by lightning," *id.*, at 309 (Stewart, J., concurring).

Chief among the reasons for this unpredictability is the fact that similarly situated defendants, charged and convicted for similar crimes within the same State, often receive vastly different sentences. Professor John Kaplan of the Stanford Law School has summarized the dilemma:

> "The problem [of error in imposing capital punishment] is much more serious if we consider the chances of error in the system to be more than the execution of someone who is completely innocent—the ultimate horror case. Though examples of victims of mistaken identity are sometimes found on death row, the far more common cases fall into two types. In one, the recipient of the death penalty is guilty of a crime, but of a lesser offense, for which capital punishment is not in theory available. . . .
>
> "The second type of error in capital punishment occurs when we execute someone whose crime does not seem so

aggravated when compared to those of many who escaped the death penalty. It is in this kind of case—which is extremely common—that we must worry whether, first, we have designed procedures which are appropriate to the decision between life and death and, second, whether we have followed those procedures." Kaplan, The Problem of Capital Punishment, 1983 U. Ill. L. Rev. 555, 576.

Comparative proportionality review is aimed at eliminating this second type of error.[5]

---

[5] Perhaps the easiest evidence to assemble in order to highlight the comparative disproportionality between death sentences is to examine the cases proved against the 11 men who have been executed in the United States since 1976. Of those individuals, at least four refused to process appeals on their own behalf, preferring execution to a life in prison. Among the seven others were individuals convicted of the most heinous of crimes. But even among these men, there were still unexplained differences between their crimes which went unaccounted for in their sentences.

For example, Professor Kaplan has focused his comments on the execution of John Spinkellink (spelling of this name varies): "As I read the record, he was probably guilty of voluntary manslaughter, or at most second-degree murder. He was a drifter who killed another drifter who had sexually assaulted him. Although he received capital punishment in Florida, in California most district attorneys would probably have been happy to accept a plea to second-degree murder in such a case." Kaplan, 1983 U. Ill. L. Rev., at 576. See Spinkellink v. Wainwright, 578 F. 2d 582, 586, n. 3 (CA5 1978); Spinkellink v. State, 313 So. 2d 666, 668 (Fla. 1975). Justice Ervin of the Supreme Court of Florida, writing in dissent, explained the underlying facts that support Professor Kaplan's conclusions:

"In this case it appears that [Spinkellink] at the time of the homicide was a 24-year-old drifter who picked up Szymankiewicz, a hitchhiker. Both had criminal records and both were heavy drinkers. Szymankiewicz, the victim in this case, was a man of vicious propensities who boasted of killings and forced [Spinkellink] to have homosexual relations with him. [Spinkellink] discovered that Szymankiewicz had 'relieved him of his cash reserves.'

"It was under these conditions that [Spinkellink] returned to the motel room where the homicide occurred. [Spinkellink] testified he shot Szymankiewicz in self defense. Evidence to the contrary was only circumstantial. In fact, only through such evidence was it possible to infer the crime was premeditated and different from [Spinkellink's] direct testimony

## B

Disproportionality among sentences given different defendants can only be eliminated after sentencing disparities are identified. And the most logical way to identify such sentencing disparities is for a court of statewide jurisdiction

---

that he shot Szymankiewicz in self defense. The reasoning of this Court on the suddenness in which premeditation may be formed is suspect and allowed the prosecution undue latitude to readily shift from the theory of felony murder to premeditated murder.

"It does not appear to me that in this situation there was sufficient certainty of premeditated guilt and heinousness to warrant the death penalty. When the nature of the relation between [Spinkellink] and Szymankiewicz is taken into account, along with the viciousness of the victim's character and this theft of [Spinkellink's] money, it is obvious that hostility existed between them that could have produced a mortal encounter that involved self-defense shooting.

.        .        .        .        .

"Truly characterized, the sentencing to death here is an example of the exercise of local arbitrary discretion. The two actors in the homicide were underprivileged drifters. Their surnames, Spinkellink and Szymankiewicz, were foreign and strange to the Tallahassee area. They had no family roots or business connections here. All of the ingredients were present for the exercise of invidious parochial discrimination in the sentencing process which the plural opinions of the majority in *Furman* condemned. The result here is an old story, often repeated in this jurisdiction where the subconscious prejudices and local mores outweigh humane, civilized understanding when certain segments of the population are up for sentencing for murder." *Id.*, at 673–674.

Others characterize the December 1982 execution of Charles Brooks, Jr., as inexcusably aberrational. In particular, it is alleged that the prosecution in Brooks' case failed to prove whether he or his accomplice—one Woodrow Loudres, who eventually obtained a 40-year sentence in a plea bargain—fired the fatal shot. Indeed, before Brooks was executed, his prosecutor joined those seeking to stay his execution. See Goodpaster, Judicial Review of Death Sentences, 74 J. Crim. L. & Criminology 786, 786–787 (1983); Los Angeles Times, Dec. 6, 1982, p. 9, col. 1; Los Angeles Daily Journal, Dec. 8, 1982, p. 7, col. 1. See also *Brooks* v. *Estelle*, 459 U. S. 1061, 1063 (1982) (BRENNAN, MARSHALL, and STEVENS, JJ., dissenting from denial of stay); *Brooks* v. *Estelle*, 697 F. 2d 586, 588 (CA5 1982) *(per curiam)*.

to conduct comparisons between death sentences imposed by different judges or juries within the State. This is what the Court labels comparative proportionality review. See *ante*, at 42–44. Although clearly no panacea, such review often serves to identify the most extreme examples of disproportionality among similarly situated defendants. At least to this extent, this form of appellate review serves to eliminate some of the irrationality that currently surrounds imposition of a death sentence. If only to further this limited purpose, therefore, I believe that the Constitution's prohibition on the irrational imposition of the death penalty requires that this procedural safeguard be provided.

Indeed, despite the Court's insistence that such review is not compelled by the Federal Constitution, over 30 States now require, either by statute or judicial decision, some form of comparative proportionality review before any death sentence may be carried out.[6] By itself, this should weigh heavily on the side of requiring such appellate review. Cf. *Enmund* v. *Florida*, 458 U. S. 782, 788–796 (1982); *Coker* v. *Georgia*, 433 U. S. 584, 593–596 (1977). In addition, these current practices establish beyond dispute that such review can be administered without much difficulty by a court of statewide jurisdiction in each State.

Perhaps the best evidence of the value of proportionality review can be gathered by examining the actual results obtained in those States which now require such review. For example, since 1973, the statute controlling appellate review of death sentences in the State of Georgia has required that

---

[6] For a complete list of these state statutes and decisions, see App. A to Brief for Respondent. See also Baldus, Pulaski, Woodworth, & Kyle, Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach, 33 Stan. L. Rev. 1, 2–3, n. 2 (1980); Goodpaster, *supra*, at 793, n. 61.

Although the Court today holds that the States are not constitutionally compelled to conduct comparative proportionality reviews, each State of course remains free to continue the practice.

the Supreme Court of Georgia determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ga. Code Ann. § 17–10–35(c)(3) (1982). See *ante*, at 43, n. 7; *Gregg* v. *Georgia*, 428 U. S., at 166–168, 198, 204–206 (opinion of Stewart, POWELL, and STEVENS, JJ.). Pursuant to this statutory mandate, the Georgia Supreme Court has vacated at least seven death sentences because it was convinced that they were comparatively disproportionate. See, *e. g.*, *High* v. *State*, 247 Ga. 289, 297, 276 S. E. 2d 5, 14 (1981) (death sentence disproportionate for armed robbery and kidnaping); *Hall* v. *State*, 241 Ga. 252, 258–260, 244 S. E. 2d 833, 838–839 (1978) (death sentence disproportionate for felony murder when codefendant received life sentence in subsequent jury trial); *Ward* v. *State*, 239 Ga. 205, 208–209, 236 S. E. 2d 365, 368 (1977) (death sentence disproportionate for murder when defendant had received life sentence for same crime in previous trial); *Jarrell* v. *State*, 234 Ga. 410, 424–425, 216 S. E. 2d 258, 270 (1975) (death sentence disproportionate for armed robbery); *Floyd* v. *State*, 233 Ga. 280, 285, 210 S. E. 2d 810, 814 (1974) (same); *Gregg* v. *State*, 233 Ga. 117, 127, 210 S. E. 2d 659, 667 (1974) (same), aff'd on other grounds, 428 U. S. 153 (1976); *Coley* v. *State*, 231 Ga. 829, 835–836, 204 S. E. 2d 612, 616–617 (1974) (death sentence disproportionate for rape). Cf. *Hill* v. *State*, 237 Ga. 794, 802–803, 229 S. E. 2d 737, 743 (1976) (death sentence not disproportionate even though unclear which defendant actually committed murder; sentence later commuted to life imprisonment by Board of Pardons and Paroles).

Similarly, other States that require comparative proportionality review also have vacated death sentences for defendants whose crime or personal history did not justify such an extreme penalty. See, *e. g.*, *Henry* v. *State*, 278 Ark. 478, 488–489, 647 S. W. 2d 419, 425 (1983); *Sumlin* v. *State*, 273 Ark. 185, 190, 617 S. W. 2d 372, 375 (1981); *Blair* v.

*State,* 406 So. 2d 1103, 1109 (Fla. 1981); *McCaskill* v. *State,* 344 So. 2d 1276, 1278–1280 (Fla. 1977); *People* v. *Gleckler,* 82 Ill. 2d 145, 161–171, 411 N. E. 2d 849, 856–861 (1980); *Smith* v. *Commonwealth,* 634 S. W. 2d 411, 413–414 (Ky. 1982); *State* v. *Sonnier,* 380 So. 2d 1, 5–9 (La. 1979); *Coleman* v. *State,* 378 So. 2d 640, 649–650 (Miss. 1979); *State* v. *McIlvoy,* 629 S. W. 2d 333, 341–342 (Mo. 1982); *Munn* v. *State,* 658 P. 2d 482, 487–488 (Okla. Crim. App. 1983).[7]

What these cases clearly demonstrate, in my view, is that comparative proportionality review serves to eliminate some, if only a small part, of the irrationality that currently infects imposition of the death penalty by the various States.   Before any execution is carried out, therefore, a State should be required under the Eighth and Fourteenth Amendments to conduct such appellate review.   The Court's decision in *Furman,* and the Court's continuing emphasis on meaningful appellate review, see, *e. g., ante,* p. 54 (STEVENS, J., concurring in part); *Barclay* v. *Florida,* 463 U. S., at 988–989 (MARSHALL, J., dissenting), require no less.

## III

The Court today concludes that our prior decisions do not mandate that a comparative proportionality review be conducted before any execution takes place.   Then, simply because the California statute provides both a list of "special circumstances" or "factors" that a jury must find before im-

---

[7] Ironically, although the California death penalty statute reviewed in this case does not require comparative proportionality review, most other felony sentences in the State are subject to a mandatory, and highly complex, system of comparative review.   See Cal. Penal Code Ann. § 1170(f) (West Supp. 1983) ("Within one year after the commencement of the term of imprisonment, the Board of Prison Terms shall review the sentence to determine whether the sentence is disparate in comparison with the sentences imposed in similar cases").   California therefore accords greater protection to felons who are imprisoned than to felons who may be executed.

posing a death sentence and judicial review of those findings, the Court upholds the California sentencing scheme. At no point does the Court determine whether comparative proportionality review should be required in order to ensure that the irrational, arbitrary, and capricious imposition of the death penalty invalidated by *Furman* does not still exist. Even if I did not adhere to my view that the death penalty is in all circumstances cruel and unusual punishment, I could not join in such unstudied decisionmaking.

I dissent.