Steve G. FRANKLIN, Petitioner,

v.

Larry SMALL, Warden, Respondent.

No. C99–5348 EDL.

United States District Court,
N.D. California.

Sept. 20, 2001.

---

Steve G. Franklin, CSP-CorcoranI, CA State Prison, Corcoran, CA.

Christopher W. Grove, CA State Attorney General's Office, San Francisco, CA.

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

LaPORTE, United States Magistrate Judge.

### INTRODUCTION

Steve G. Franklin, a California prisoner incarcerated at Corcoran State Prison, filed this action for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Both petitioner and respondent consented to proceed before a United States Magistrate Judge. Franklin's amended petition is now before the court for consideration on the merits. For the reasons discussed below, the court will deny the petition.

### BACKGROUND

#### A. *Procedural History*

At a jury trial in the Alameda County Superior Court, Franklin was found guilty of two counts of robbery and two counts of receiving stolen property. The jury also found that he had suffered several prior felony convictions, i.e., a 1973 assault with a deadly weapon conviction, a 1977 burglary conviction, four 1981 burglary convictions, and a 1990 robbery conviction. He was sentenced to a term of 120 years to life in prison on May 8, 1997. Franklin appealed his conviction; the California Court of Appeal affirmed the judgment of conviction and the California Supreme Court denied his petition for review. The California Supreme Court also denied Franklin's petition for writ of habeas corpus.

Franklin then filed this action to obtain a federal writ of habeas corpus. The court reviewed Franklin's petition and dismissed it with leave to amend to cure certain deficiencies identified by the court. Franklin then filed an amended petition. The court reviewed the amended petition and issued an order to show cause why the writ should not issue. Respondent has filed an answer and Franklin has filed a traverse.

#### B. *The Crimes*

##### 1. *Robbery of Darol Wallace*

This criminal charge concerned an incident during which Franklin admittedly took money from Darol Wallace. The prosecution presented the following evidence. Wallace shared a home with his girlfriend, Beverly Ray, who was Franklin's mother. Franklin came to the home on December 23, 1994, claiming to be looking for personal property (i.e., a bag of clothes and martial arts gear) that Franklin thought Wallace had stolen and/or sold. Franklin walked around the rooms in the house looking for his property but did not find it. Wallace told Franklin to leave and warned that he could call the police if Wallace did not do so. Franklin hit Wallace and pushed him. Wallace fell over a table and landed on a couch. While Wallace was laying on the couch, Franklin

grabbed him by the throat and demanded to know where his property was. Franklin grabbed money protruding from Wallace's pocket as Wallace lay on the couch and Franklin then choked him for a bit longer. After Franklin left, Wallace called the police. Wallace was 67 years old at the time.

Franklin's defense was that he had not taken the money by force or threat of force. Franklin testified that Wallace "came at" him with his hands raised so Franklin hit him in the face and threw him down in "self defense." RT 761. Wallace fell onto the couch; while he lay there, Franklin grabbed his throat, and squeezed it between his thumb and forefinger to apply a kind of accupressure to "relax" Wallace. RT 763, 859. While grabbing Wallace by the throat, he demanded to know where his property was. Wallace told Franklin that he did not know where the property was. Franklin then took money that he saw sticking halfway out of Wallace's pocket. He took the money and intended to keep it; indeed, he intended to get more money later from Wallace. Franklin invited Wallace to call the police but Wallace declined. Franklin also tried to discredit Wallace by showing he had suffered two felony convictions and by showing that they had disliked each other for years.

## 2. Receiving Stolen Property That Belonged To Ralph Cantor

The prosecution presented evidence that Ralph Cantor was robbed at about 11:30 p.m. on January 18, 1995 when he took his bicycle down a driveway to park it in his garage. When Cantor arrived at the garage area, a man (who he later identified as Franklin) displayed a gun and demanded that Cantor give him money and a watch. Cantor complied. The man threatened to shoot Cantor. The man then walked up the driveway and disappeared from Cantor's sight. Cantor reported the incident immediately to the

police. Within a month of the incident, Cantor identified Franklin as the robber in a photo lineup presented to him at his office and in a physical lineup at the Oakland police department. Cantor also identified a watch recovered from Franklin as the watch that had been stolen from him. He was able to identify the watch by its Eddie Bauer brand, its replacement wrist band and scratches on its crystal.

Franklin's defense was that the victim had misidentified him. He tried to show that Cantor's ability to observe the robber was hampered by the darkness of the location and because the robber wore a cap and a hooded jacket. He tried to show that Cantor actually had recognized him in the photo and physical lineups because they had been teachers at the same junior high school in the early 1970s. Franklin also tried to show that the lineups had been unduly suggestive. And he tried to show that inspector Wolke planted the watch in his belongings by showing that the watch was not listed on the original police department property inventory when an officer inventoried the backpack in which the watch allegedly was found.

The prosecution urged that Franklin had robbed Cantor or at least had received stolen property that belonged to him. Franklin was convicted on only the receiving stolen property count.

## 3. Robbery of Elizabeth Groenewegen

On the night of January 20, 1995, Elizabeth Groenewegen was attacked from behind while walking home from a BART station. A man (who she later identified as Franklin) approached her from behind, grabbed her and tried to cover her mouth with his hands. He told her he would cut her if she screamed. Groenewegen screamed and struggled, causing both her and the man to fall backwards to the ground; Groenewegen then saw the man's

face. Groenewegen continued to struggle with the man for control of her shoulder bag containing a purse and clothes. She let go of the bag and the man departed with the bag. Groenewegen's face had been scratched by the man. Groenewegen identified Franklin as the robber in a lineup within a month of the robbery and again identified him at trial.

Franklin's defense to this charge was misidentification by the victim. He challenged Groenewegen's ability to observe the man on the dark and misty night on which the robbery took place. He also presented evidence that he had certain characteristics different from those possessed by the assailant as described by Groenewegen: although the man who attacked Groenewegen was not physically powerful, Franklin was physically powerful and trained in martial arts; although Groenewegen had been scratched by the man, Franklin wore his fingernails cut short for his martial arts activities; although Groenewegen's attacker looked like a "homeless-type," RT 263, Franklin was very neat and well-groomed; although Groenewegen's attacker was unshaven, Franklin had worn a distinctive mustache for years. Franklin also tried to show that the lineup at which Groenewegen identified him was improperly suggestive.

### 4. Receiving Stolen Property That Belonged To Elizabeth Blakely

At trial, the prosecution presented evidence that Elizabeth Blakely's house was burglarized in the late morning on January 30, 1995 by Franklin and his girlfriend, Sonia Leseur. Blakely was in bed asleep late in the morning when she heard a knock at the door and the sound of the door being kicked in. Blakely heard a man's voice and a woman's voice coming from the living room although she never saw either person in her house. Blakely heard the woman ask the man whether she should take the stereo and heard the man respond that the woman should take the compact discs and the man would look for the keys. Blakely climbed out of her bedroom window and went next door to have a neighbor call the police. As the neighbor called the police, Blakely watched the front door of her home. A man wearing a backpack pushing her roommate's bicycle and carrying a black bag emerged and then a woman pushing Blakely's bicycle emerged through the front door. The man departed before Blakely saw police arrive, but one police officer arrived in time to detain Leseur. Leseur had dozens of Blakely's compact discs and other property in her backpack. Meanwhile, another police officer who heard the first officer's broadcast that the man was on the sidewalk, caught sight of a man pushing a bicycle away from the house and chased him. The officer lost sight of the man at one point. The officer saw several citizens pointing and he followed their directions into the driveway of Grandma's Bed and Breakfast. There he caught Franklin. Franklin had a backpack containing dozens more compact discs that belonged to Blakely. Blakely never claimed to have seen the face of the male burglar and never identified Franklin as the burglar. When the officer frisked Franklin, he recovered from Franklin's waistband a pellet gun that looked like a revolver and recovered from Franklin's inner jacket a police badge.

Franklin's defense to this charge was that he was an innocent and unlucky bystander. He said that he had been walking with his girlfriend when an acquaintance named Deek convinced Franklin's girlfriend to go with him for a few minutes for an unstated purpose. Franklin waited and went into Grandma's yard so he would be off the street. While he was there, Deek returned, handed a backpack to him, and ran off. Immediately thereafter, the police apprehended Franklin at Grandma's. Franklin explained that he had

found the pellet gun and badge earlier that day. Through cross-examination, Franklin was able to show that there were gaps during which police lost sight of the man being chased. He also presented testimony of a witness who saw a man pushing a bicycle in the area at the time; the witness at one time indicated the man was white or at least had light skin color although he had indicated at another time that the man was African American.

The prosecution urged that Franklin was guilty of burglary of the Blakely residence or receiving stolen property from the Blakely residence. The jury convicted him of receiving stolen property.

## C. *Franklin's Frame–Up Defense*

In addition to his defenses specific to each of the crimes, Franklin offered as a defense to the charges the theory that he was that he was being singled out unfairly by the Berkeley Police Department. He argued that inspector Wolke in particular was trying to frame him because Wolke was unable to arrest him for a murder that Wolke thought Franklin committed. Franklin and another lineup participant testified that during the lineup there was considerable talking and laughing coming from the area where the witnesses were viewing the lineup. They testified that the noise continued until Franklin was asked to step forward and then the noise stopped abruptly. Evidence also was presented that Wolke had twice tried to do polygraph examinations on Franklin in December 1994 concerning the murder case but was unable to complete either exam.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, which is locat-

ed within this judicial district. 28 U.S.C. 2241(d).

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application

must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b),(c).

The parties do not dispute that Franklin exhausted his state court remedies as to his claims that he was denied due process by the "pervasive atmosphere of hostility" at his trial and that he received ineffective assistance of appellate counsel. An interesting exhaustion problem arises because Franklin cites to some federal case law and constitutional provisions in discussing the component parts of his "pervasive atmosphere of hostility" claim. In his federal petition, Franklin cites to federal cases and constitutional provisions in support of his argument that the pervasive atmosphere of hostility was shown by the trial court's denial of his motion to substitute attorneys, the trial court's denial of discovery motions during the time Franklin represented himself, the use of a suggestive photo lineup, and the denial of his motion to strike a prior conviction. Franklin never presented these to the California Supreme Court as individual violations of his federal constitutional rights. He did, however, cite federal authorities in support of two arguments in support of his "pervasive atmosphere of hostility" claim in his petition for review to the California Supreme

Court. Specifically, he cited *United States v. Moore*, 159 F.3d 1154 (9th Cir.1998), in support of his argument that hostility was shown by the trial court's denial of his motion to substitute counsel and he cited *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), in support of his argument that hostility was shown by the trial court's denial of his motion to strike a prior conviction. *See* Petition For Review, pp. 5 and 7. The court will assume for purposes of argument that these two citations in the petition for review sufficiently presented these claims to the California Supreme Court and will explain in footnotes the claims' resolution as if they had been brought as separate claims as well as components of the "pervasive atmosphere of hostility" claim.

## DISCUSSION

### A. *"Pervasive Atmosphere Of Hostility" Claim*

Franklin claims that a "pervasive atmosphere of hostility towards petitioner, his attorney, and his family permeated his trial and denied petitioner due process of law under the state and federal constitution." Petition, attachment three, p. 1. Franklin wrote that he had "put on the record numerous instances of conduct toward him in this case which indicate trial court error in its rulings, problems with his attorney, hostility of court and judicial system personnel and other offensive behavioral [sic].... The court made ruling after ruling against petitioner many plainly erroneous under the law and others evincing an abuse of discretion.... Many of the errors occurring were in and of themselves enough to require reversal. Taken in toto the cumulative effect of the errors and prejudice petitioner suffered add up to denial of Due Process." *Id.*

■ The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *See In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (fair trial requires the absence of actual bias by the judge). When the question of the propriety of the state court judge's conduct is raised in a habeas action, the inquiry is "whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez,* 67 F.3d 734, 740 (9th Cir.1995), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996); *see, e.g., Ortiz v. Stewart,* 149 F.3d 923, 939–40 (9th Cir.1998), *cert. denied,* 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999) (post-conviction relief judge's evident disdain for petitioner's argument that several of his attorneys were ineffective for failing to discover each other's ineffectiveness simply reflected judge's frustration with the number of petitioners who attempted to manipulate the criminal justice system and did not amount to unconstitutional bias); *cf. Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.").

■ Two other principles must be kept in mind when analyzing Franklin's claim. The first principle is that the federal habeas writ is not available to correct violations of state law such as state court errors in interpreting or applying state law. The federal writ is available "only on the basis of some transgression of federal law binding on the state courts." *Middleton v. Cupp,* 768 F.2d 1083, 1085 (9th Cir.1985). *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986). A state court error will warrant federal habeas relief only if it has infringed upon a specific federal constitutional or statutory provision or has deprived the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Jammal v. Van de Kamp,* 926 F.2d 918, 919–20 (9th Cir.1991); *Middleton,* 768 F.2d at 1085. Whether or not the trial court erred under California law in its rulings at Franklin's trial is "largely beside the point" in this court's analysis. *Jammal,* 926 F.2d at 919.

■ The second principle that must be kept in mind is that the cumulative error doctrine permits the court to consider the combined effect of several errors, but does not permit the court to consider the combined effect of several non-errors. The cumulative error doctrine recognizes that sometimes, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See McDowell v. Calderon,* 107 F.3d 1351, 1368 (9th Cir.) (cumulative effect of errors may deprive habeas petitioner of due process right to fair trial), *amended,* 116 F.3d 364 (9th Cir.1997), *vacated in part by* 130 F.3d 833, 835 (9th Cir.1997) (en banc), *cert. denied,* 523 U.S. 1103, 118 S.Ct. 1575, 140 L.Ed.2d 807 (1998). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Fuller v. Roe,* 182 F.3d 699, 704 (9th Cir.1999). Franklin cannot bypass the need to show constitutional errors by urging that many non-errors added up to prejudice him.

The court now considers the specific incidents that Franklin contends prove that there was a pervasive atmosphere of hos-

tility at his trial that denied him his right to due process.

1. *Marsden* hearing.

Franklin argues that he was forced to represent himself because the court erroneously denied his motion to substitute counsel under *People v. Marsden*, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (Cal. 1970). The California Court of Appeal determined that Franklin had not established that the *Marsden* motion had been improperly denied.

Franklin complains that the trial court's denial of his motion to dismiss the public defender and substitute private counsel was erroneous and forced him to represent himself. In the trial court, Franklin stated that he had no confidence in the public defender's office and sought court-appointed counsel. The court heard from Franklin's former public defender about the decisions that had been made while he represented Franklin. The trial court denied this motion after concluding that the defense of Franklin was appropriate, thorough and vigorous. It concluded that Franklin's dissatisfaction arose because he and defense counsel had different tactical approaches to his defense. Thus, the trial court denied the *Marsden* motion for lack of sufficient grounds to warrant the removal of the public defender.

On appeal, Franklin complains that the trial court erred by focusing only on the quality of counsel's representation. He contends that the gist of his motion was that communication between himself and the entire public defender's office had broken down. The trial court's express findings suggest otherwise, as it may be implied from the conclusion that Franklin and his counsel disagreed about the proper tactics for his defense that communication did occur between these parties. The trial court made an adequate inquiry into the reasons Franklin assert-ed for his *Marsden* motion, defense counsel offered a vigorous defense, and Franklin was actively involved in that defense. [Citation.] Franklin has not established any *Marsden* error on the part of the trial court.

Respondent's Exh. A, California Court of Appeal opinion ("Cal.Ct.App.Opinion"), pp. 12–13.

The California Court of Appeal's determination that the trial court did not err as a matter of state law in denying the *Marsden* motion is not reviewable in this court. *See Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. 871. The issue for this court is whether the hearing or decision on the *Marsden* motion evidences the pervasive atmosphere of hostility that Franklin claims.

Franklin points to nothing specific about the hearing, other than its outcome, to show a pervasive atmosphere of hostility. Nothing in the transcript indicates judicial hostility to Franklin. Judge Horner heard the matter on February 23, 1996 after Franklin had filed a *Marsden* motion in which he stated the various grounds for the motion. The *Marsden* motion was made after the preliminary hearing but before trial and was heard by a judge other than the judge who presided over Franklin's trial.

At the *Marsden* hearing, Franklin's former public defender (Mr. McCarthy) and then-current public defender (Mr. Locke) were permitted to respond to the many allegations made in Franklin's *Marsden* motion. McCarthy explained that he had supplied to Franklin all the materials Franklin needed, including police reports and the preliminary hearing transcript. McCarthy had not given the "investigation return" to Franklin as a matter of policy because the return would lose its confidential status if sent to Franklin in jail. Feb. 23, 1996 RT 8. McCarthy did, however,

discuss the investigation return with Franklin. McCarthy then refuted the claim that he had not kept in contact with Franklin; McCarthy said he had visited Franklin a number of times in the county jail and also had talked with him in telephone calls. In response to Franklin's claim that the public defender had not given him all the motions filed by the District Attorney's office, McCarthy said that there was only one motion—a one-page motion to amend the complaint—and he did not know if that had been given to Franklin or whether it had been granted. McCarthy refuted the allegation that he had failed to subpoena favorable witness Sonya Leseur by stating that for tactical and legal reasons it was inappropriate to subpoena her: Leseur had been arrested with Franklin, Leseur had a Fifth Amendment right not to testify, and the public defender's office had information to suggest any testimony she gave would not be favorable to Franklin. McCarthy characterized as "just not correct" Franklin's allegation that the public defender's office failed to do necessary investigations. *Id.* at 11. He explained that contact was made with all or almost all of the complainants and the public defender's office had interviewed several witnesses. In response to Franklin's allegation that he had failed to prepare an affirmative defense at the preliminary hearing, McCarthy explained that he had made a tactical decision not to attempt to present an affirmative defense then, as it would not have been in Franklin's interest and any witness called could be cross-examined to the detriment of Franklin. McCarthy also said that he had made appropriate objections to the District Attorney's questions at the preliminary hearing. McCarthy responded to Franklin's allegation that he failed to file motions critical to the defense by explaining that, against his own judgment but in deference to Franklin's demand, he had filed an unsuccessful motion

in Municipal Court regarding the strike priors; the judge in Municipal Court told him the motion belonged in Superior Court, as McCarthy had expected. McCarthy said that he did not know of a conflict between his office and Franklin and denied Franklin's allegation that the public defender's office was acting as a surrogate prosecutor. In response to an allegation that he had given Franklin's confidential legal papers to a victim, McCarthy explained that he had received conflicting instructions on the disposition of the papers which were irrelevant to this case and, pursuant to one of Franklin's instructions, had sent one folder to Franklin and another folder back to the victim (Wallace) who originally had given the materials to McCarthy.

Judge Horner next permitted Franklin to respond to the public defenders' statements, which Franklin did. Franklin disagreed with many of the statements made by McCarthy. The judge also inquired whether Franklin had other reasons to support of his *Marsden* motion. Finally, Judge Horner ruled and denied the *Marsden* motion. Immediately following the judge's denial of his *Marsden* motion, Franklin moved to represent himself under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The court set a hearing date for Franklin's *Faretta* motion about ten days later and urged him to reflect carefully on the very serious concerns raised by a *Faretta* motion.

■ There is not a whit of support for Franklin's assertion that the *Marsden* proceedings evidenced a pervasive atmosphere of hostility against him. The transcript reflects a detailed *Marsden* hearing during which the court allowed Franklin and the public defenders to express their views on the facts. The trial court's denial of the motion was not legally erroneous

under state law. *See* Cal. Ct.App. opinion, p. 13. And the denial of the motion simply does not demonstrate hostility toward Franklin.[1] Requiring Franklin to show cause to support his request for a new publicly-funded attorney to replace the public defender and denying the request when he did not do so was not at all inappropriate. Finally, the denial of Franklin's *Marsden* motion did not force Franklin to represent himself. The public defender remained available to Franklin. Franklin's decision to represent himself rather than to proceed with the public defender that the court had determined was not in irreconcilable conflict was not forced by the court.

### 2. *Discovery Difficulties During Self-Representation*

Franklin claims that, during the period he was representing himself, he had problems getting access to information as a result of which he felt forced to accept representation by appointed counsel to get a fair trial. The California Court of Appeal rejected this claim.

> He offers no explanation of prejudice resulting from his lack of access to vaguely described records, other than to claim that it was part of a "pervasive atmosphere of hostility" that deprived him of his due process rights. A specific prejudice claim would be untenable, as

Franklin admits that once the public defender was reappointed, those records that had not been provided to him were then made available to counsel. If a defendant would prevail on a claim of denial of timely discovery, he or she must both establish prejudice and show that a continuance would not have cured the harm. [Citation.] As he attempts to show no specific prejudice and as the evidence he sought was later provided to his defense, Franklin has not established this claim of error on appeal.

Cal. Ct.App. opinion, pp. 13–14.

Franklin has not established any pervasive atmosphere of hostility with regards to his discovery difficulties while he was pro per. Franklin points to the hearings on August 20 and 22, 1996 and December 20, 1996 as evidence of the difficulties but the transcripts do not show any hostility toward him.

At the hearing on August 20, 1996, Franklin told the court (Judge Sarkisian) that he was not ready for trial because he had been unable to contact his investigator. The court made arrangements for Franklin to attempt to call the investigator as soon as the hearing ended. The court also allowed Franklin to call a witness in Modesto that day from the court. The court's response to Franklin's difficulties

---

1. Even if one assumes that Franklin intends to assert that the denial of his *Marsden* motion as an independent claim for a violation of his Sixth Amendment right to counsel, he would not prevail. Franklin has not shown that the conflict between him "and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek,* 218 F.3d 1017, 1026 (9th Cir.2000) (en banc). As discussed in the text, the public defender did not think that there was a conflict with Franklin and the public defender adequately responded to the many complaints made by Franklin in his *Marsden* motion. The court held a thorough and adequate hearing on the motion, allowing both defense counsel and Franklin to fully present their views before ruling on the motion. The court correctly determined that the difficulties between Franklin and his counsel were not so great as to show a complete breakdown of the relationship. "[N]ot every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Id.* at 1027. The difficulties between Franklin and his counsel did not amount to the denial of effective assistance of counsel.

shows an accommodating court, not a pervasive atmosphere of hostility.

■ At a hearing two days later, the court denied Franklin's motion for co-counsel. Franklin eventually agreed to be represented by a public defender but wanted to continue to have library privileges in jail. Franklin argues that the court's denial of his motion for co-counsel forced him to accept representation by the public defender. Franklin was not impermissibly coerced on this point. The court was not required to appoint co-counsel. *See United States v. Kienenberger,* 13 F.3d 1354, 1356 (9th Cir.1994) (criminal "defendant does not have a constitutional right to 'hybrid' representation"). Franklin remained free to choose between self-representation and representation by the public defender's office. The failure to give him a third option to which he was not legally entitled does not evidence judicial hostility toward Franklin or his case.

At a hearing on December 20, 1996—at which time Franklin was again represented by the public defender—Franklin complained to the court that he had not received when he was pro per all the materials he received once the public defender resumed representing him. He claimed that the clerk's office and district attorney's office had not produced documents he asked for. He did not allege that the court had denied any discovery request. Franklin acknowledged that he did not want the court to do anything about the problem; he just wanted to put his past difficulties on the record as they showed he felt he was forced to abandon his self-representation and return to representation by the public defender. Nothing at this hearing evidenced any judicial hostility to Franklin.

### 3. *Denial of Police Files*

Franklin contends that he was denied discovery of a Berkeley police department file for an ongoing homicide investigation. Franklin believed he was a suspect in that homicide and believed that Berkeley police inspector Wolke and other police officers were biased against him in the present case because they were unable to arrest him for the homicide case.[2] At the hearing on the motion to discover the homicide file, inspector Wolke explained that he had twice tried to conduct lie detector tests on Franklin in December 1994 about the homicide. He was unable to complete the tests because Franklin fell asleep and was uncooperative during the tests (e.g., giving narrative rather than yes/no answers). According to Wolke, homicide detectives asked him to polygraph Franklin because Franklin was seen with the victim shortly before her death. Inspector Wolke testified that he worked in the robbery division, not the homicide division, and he was not a homicide detective; however, he was the only polygraph examiner in the Berkeley police department. The prosecutor urged that the discovery motion be denied because it would be highly prejudicial to turn over the files of the open case to Franklin who had not been formally charged in that homicide case. The trial court denied the discovery motion, but allowed defense counsel to present evidence that police were framing Franklin in the present case because he was a suspect in the homicide case. Franklin later did so by questioning witnesses about the circumstances of the lineups and the circumstances of the recovery of Cantor's watch and the police badge. Franklin argued at trial that Inspector Wolke wanted to frame him because he suspected Franklin of the homicide.

2. Before trial, defense counsel's motion to obtain personnel information about inspector

Wolke was denied because the records did not contain any discoverable information.

The state appellate court rejected Franklin's argument that the denial of the discovery motion was improper. The court noted that a criminal defendant could defend on the ground that he was the subject of discriminatory police activity and could discover information relevant to this defense if he established a prima facie case of discrimination. The court found that Franklin had not made such a showing: "There was no nexus between this criminal investigation and the pending charges other than Franklin's suspected involvement in them. Franklin's justification of bias was not sufficiently plausible to justify the release of police records of an unresolved homicide in which Franklin himself was a suspect." Cal. Ct.App. opinion, p. 15. The trial court did not abuse its discretion in denying Franklin "access to sensitive information unrelated to the crimes he was charged with having committed in the present matter." *Id.*

■ The court's denial of the discovery motion was not improper. The court balanced Franklin's unsupported hunch that the file might contain evidence showing police bias against the fact that the file contained information in an ongoing homicide investigation in which Franklin may have had culpability. (The court modified its ruling later and ordered the prosecutor to turn over all the reports generated by Wolke.) Moreover, Franklin was afforded ample opportunity to present evidence and argument concerning Wolke's alleged bias and the problems with the lineups.

Franklin unsuccessfully tried to show that Wolke had orchestrated a suggestive lineup. Franklin and another participant testified that there was considerable noise at the physical lineup that stopped abruptly when Franklin stepped forward. But the evidence contrary to a frame-up was significant. Neither of the victims who identified him at the lineup remembered any unusual noise. Although Franklin had

been represented by a public defender at the lineup, there was no evidence that the public defender protested about any condition at the lineup. Franklin, rather than inspector Wolke, picked the "fillers" who participated in the live lineup with Franklin. The jury verdict implicitly rejected Franklin's contention that the lineup was unfair.

The hearing on the discovery motion does not contain evidence of a pervasive atmosphere of hostility. And the rejection of the motion was not an arbitrary decision. Franklin only speculates that discovery of the homicide file would have helped him. That is not enough to show a denial of due process.

#### 4. *The Photo Lineup*

Franklin argues that the photo lineup viewed by Ralph Cantor was unduly suggestive because Franklin was the only one of the six men who was wearing what appeared to be a puffy jacket with a hood and zipper, which was identical to the robber's clothing Cantor described to the police. The trial court rejected Franklin's pretrial motion to exclude the lineup as unduly suggestive. The California Court of Appeal rejected Franklin's challenge to the suggestiveness of the photo lineup, finding that there was no harm from any error because Franklin was not convicted of robbing Cantor, but only of receiving stolen property that belonged to Cantor. Cal. Ct.App. Opinion, p. 16. The receiving stolen property conviction did not depend on the identification of Franklin. *Id.* Franklin argues that, even though he was not convicted of a crime that depended on the photo identification, the introduction of the photo identification infected the overall trial proceedings.

■ The admission of the photo lineup identification did not evidence a pervasive atmosphere of hostility. Franklin was al-

lowed to and did cross-examine the victim about his pretrial and trial identifications of Franklin and was allowed to and did cross-examine inspector Wolke about his preparation of the photo and physical lineups. The fact that the jury convicted Franklin of receiving stolen property rather than robbery shows that the jury was not convinced by Cantor's identification of Franklin. And the evidence did not taint the rest of the trial: if the jury was able to discount it on the one count for which it mattered, the jury most likely discounted it overall. The admission of the photo lineup identification did not result in fundamental unfairness at Franklin's trial.

### 5. The Refusal To Strike A Prior Robbery Conviction

Facing the prospect of a lengthier sentence because he had several prior convictions, Franklin moved to strike one of those prior convictions, a 1990 conviction for robbery, on the ground that he had received ineffective assistance of counsel and had not voluntarily and intelligently entered a plea in that proceeding. The trial court in the present proceeding held an evidentiary hearing at which Franklin and the attorney who represented him in the 1990 plea proceedings testified and the trial court reviewed the transcript of the 1990 proceedings. The trial court denied the motion to strike the prior. The California Court of Appeal rejected Franklin's argument that the trial court erred in denying the motion to strike:

> In 1990, he initially indicated some confusion about which of two charges he would plead to when he changed his plea. Then, counsel advised the court that Franklin would plead guilty to a weapons charge and plead no contest to the robbery charge. Franklin proceeded to do exactly that. He specifically agreed that he understood that his plea to this robbery could result in an enhanced sentence if he was later convicted of another serious felony. The trial court indicated that he would be sentenced to three years on whichever charge entitled Franklin to the most credit for time served and Franklin agreed.

During a hearing on the validity of this prior conviction in the present matter, Franklin testified that he believed that he was to plead guilty to the weapons charge, he would receive a three-year term and the trial court would dismiss the robbery charge. He was not willing to plead guilty to the robbery—he did not believe that there was sufficient proof to convict him of that charge. However, Franklin did what his counsel insisted he do—plead no contest to the robbery. Franklin wanted to speak up about this, but his defense counsel told him to go along with this plan in order to be out of jail sooner than he otherwise would. Franklin thought pleading no contest was a plea of not guilty, rather than a plea that was the equivalent of a plea of guilty. The bargain he entered into was different than he expected it to be, Franklin testified. He denied understanding his constitutional rights when he pled no contest to the robbery charge. Counsel who represented Franklin at the 1990 change of plea hearing also testified about his recollection of events. The trial court denied the motion to strike, concluding that the transcript of the plea hearing and Franklin's lengthy experience with the criminal justice system convinced it that Franklin understood his rights. It concluded that Franklin had not met his burden of proof that, considering the totality of the evidence, the plea was not voluntarily or intelligently given.

When a defendant collaterally attacks the validity of a prior conviction alleged as a sentence enhancement, the defendant has the burden of proof to establish

the defects alleged. The prior conviction is presumptively valid and the defendant must prove that he or she did not voluntarily and intelligently plead guilty to the charges then pending. (See *Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1303, 276 Cal.Rptr. 49, 801 P.2d 292 [special circumstances case].) A guilty plea is valid if the record affirmatively shows that it was voluntary and intelligent under the totality of the circumstances. (*People v. Howard* (1992) 1 Cal.4th 1132, 1175, 5 Cal.Rptr.2d 268, 824 P.2d 1315, cert. den. 506 U.S. 942, 113 S.Ct. 383, 121 L.Ed.2d 293.) In this matter, the trial court indicated that while Franklin was required to meet a clear and convincing evidence standard, he did not even establish his claim by a preponderance of evidence. Based on all the evidence—not just that which Franklin highlights—we are satisfied that he offered an intelligent and voluntary plea of no contest to the 1990 robbery charge. Thus, the trial court properly denied the motion to strike this prior conviction.

Cal. Ct.App. opinion, pp. 16–17.

The California courts' findings are supported by the record. *See* 28 U.S.C. § 2254(e). The trial court in the present

proceedings found that Franklin knew he was pleading to both a firearms charge and a robbery charge "and it didn't make any difference so long as he got sentenced on the one he had the most credit for time served and the sentence transcript indicates that he had about 40 more days on the robbery than he had on the [firearms charge]." RT 329. The trial court in the present proceeding found petitioner not credible in his testimony that he did not understand he was pleading no contest to robbery. The record supports the state court's determination that the plea was knowing and voluntary.

 The record on the motion to strike the prior conviction does not evidence a pervasive atmosphere of judicial hostility. The trial court did find Franklin's testimony not credible and indicated with a little dismay that Franklin either had a very poor memory or was being evasive and untruthful, *see* RT 329–330. In light of the fact that Franklin had just given testimony that repeatedly blamed everyone but himself for his convictions and guilty pleas and repeatedly disavowed recollections of adverse details, that comment by the court was not unexpected or incorrect.[3]

---

3. Even if one assumes that Franklin intends to assert the refusal to strike his prior conviction as an independent claim for a violation of his right to due process based on the use of a guilty plea not made voluntarily and intelligently, he would not prevail. A petitioner generally may not attack the constitutionality of a prior conviction used to enhance a later sentence. "[O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid.... If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under

§ 2254 on the ground that the prior conviction was unconstitutionally obtained." *Lackawanna County Dist. Attorney v. Coss*, 531 U.S. 923, ——, 121 S.Ct. 1567, 1574, 149 L.Ed.2d 608 (2001). The only exception to the rule barring challenges to prior convictions used to enhance current sentences is that a petitioner may challenge a prior conviction on the ground that there was a failure to appoint counsel in that case in violation of the Sixth Amendment. *Id.* Franklin's claim does not fit within the very small exception carved out by *Lackawanna* for complete denial of counsel cases. He cannot challenge the enhanced 1996 sentence on the ground that the 1990 robbery conviction was the product of an involuntary and unintelligent waiver.

### 6. The Denial Of A Motion For Continuance

Franklin next contends that the trial court unreasonably denied his request for a continuance to investigate and present some witnesses. On the sixth day of trial—when the trial court expected the evidence presentation to be complete and the case submitted to the jury—defense counsel moved for a one-week continuance to investigate and obtain testimony from several witnesses. (A more detailed discussion concerning the particular witnesses for whom the continuance was sought is contained in Section "B" below, which discusses Franklin's claim that his attorney was ineffective for having not investigated and obtained the witnesses' testimony in a timely fashion.) The trial court denied the motion for continuance. The California Court of Appeal found no abuse of discretion by the trial court because Franklin had not met his burden of proving due diligence in obtaining witnesses and much of the evidence proffered was cumulative. Cal. Ct.App. opinion, p. 18.

The transcript of the proceedings on Franklin's motion for a continuance does not contain any evidence of a pervasive atmosphere of hostility toward Franklin. And the denial of the motion did not evidence hostility toward Franklin.

### 7. The Refusal To Permit A Demonstration Of Franklin's Martial Arts Skills

Franklin alleges that the trial court unfairly refused to allow him to demonstrate how he would take down another person using his martial arts abilities. The purpose of the proposed demonstration was to show that Groenewegen could not have pulled Franklin to the ground if he had been her assailant because he was much too strong. The trial court denied the request because a demonstration could not reproduce the conditions surrounding the attack on Groenewegen. Franklin was in better health than at the time of the attack and the victim had testified her behavior was driven in part by a rise in adrenaline due to fright. The California Court of Appeal found no error in the trial court's exclusion of the demonstration because Franklin had not established an adequate foundation for its admission, i.e., he had not shown that the experiment could be conducted under at least substantially similar conditions to those of the actual occurrence. Cal. Ct.App. opinion, p. 19.

The transcript of the proceedings on Franklin's motion to do a demonstration of martial arts maneuver does not contain any evidence of a pervasive atmosphere of hostility toward Franklin. And the denial of the motion does not reflect hostility toward Franklin.

### 8. The Admission Of Hearsay

Franklin contends that the trial court improperly overruled his objections to hearsay testimony. He provides three examples of such rulings. The California Court of Appeal found no merit in any of Franklin's objections. As to Franklin's complaint that Inspector Wolke was permitted to testify that Groenewegen was positive about her identification of Franklin, the court said that "Franklin's hearsay objection was properly overruled because it was admissible under the prior identification exception to the hearsay rule." Cal. Ct.App. opinion, p. 19. As to Franklin's argument that the trial court erroneously permitted a police officer to read from his police report the descriptions offered by Cantor and Groenewegen of their assailants, the court found (a) no prejudice from any assumed error in the Cantor case because Franklin was not convicted of robbing him and (b) the evidence of the officer's recitation of the Groenewegen description of her assailant from his report

was admissible as a prior inconsistent statement, because the reported description differed in some respects from that which Groenewegen offered when she testified. *Id.* The third allegedly improper hearsay ruling was not described with sufficient specificity and for that reason was rejected by the California Court of Appeal. *See id.* at 20.

The transcript of the proceedings at which these hearsay objections were made and ruled upon do not contain any evidence of a pervasive atmosphere of hostility toward Franklin or his attorney.

### 9. *"Other Instances Of Discrimination Of Petitioner"*

Franklin alleges that there were other instances evidencing the discriminatory and hostile attitude of the court and prosecutor toward him. The California Court of Appeal rejected these miscellaneous complaints:

> Finally, Franklin contends that the trial court committed other acts of discrimination against him. He complains that he was denied his promised right to be present at all bench and chambers conferences with the judge; that the prosecutor reneged on a promise not to pursue the Wallace robbery charge; that a bailiff was disrespectful to him and his family; that the prosecutor intimidated certain witnesses and eavesdropped on confidential communications; and that the trial court singled out his spouse by telling her not to talk to jurors. Having reviewed each of these complaints raised in the trial court, we see neither error nor prejudice resulting from any of them. In each instance, the trial court appears to have acted within its proper authority, conducting appropriate inquiry into the complaint when needed and offering reasonable explanations for or refutation of the conduct of which Franklin complaints.

Cal. Ct.App. opinion, p. 20. Like the state appellate court, this court does not see evidence of an atmosphere of hostility in the trial court's handling of these matters.

### 10. *Cumulative Error*

Franklin argues that the cumulative effect of the many hostile acts directed at him was to deny him due process. The California Court of Appeal rejected this argument:

> In addition to claiming that the cited errors constituted prejudicial error in and of themselves, Franklin also contends that collectively, they combined to deprive him of a fair trial. He seeks a reversal of his conviction and a new trial. Simply put, our review of the record on appeal does not reveal the pattern of improper conduct, erroneous rulings, and faulty reasoning that Franklin saw in the trial court. To the extent that *any* of the errors Franklin cites might have occurred, we are satisfied that the cumulative effect of them did not rise to the level of depriving him of a fair trial. To the extent that federal due process rights were implicated, any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.) Thus, we reject his contention that a pervasive atmosphere of hostility permeated Franklin's trial.

Cal. Ct.App. opinion, p. 21.

There were not multiple constitutional errors at Franklin's trial. Thus, the cumulative doctrine does not provide an avenue of relief open to him: there are no errors to accumulate to consider their overall prejudicial effect. *See Fuller v. Roe,* 182 F.3d at 704.

Having carefully read the transcripts of the trial and pretrial proceedings in Franklin's case, this court simply does not find support in them for Franklin's

contention. No feeling of judicial hostility toward Franklin or his attorneys or his family emerge from the transcripts. Of course, rulings adverse to Franklin were made, but those adverse rulings—individually or in the aggregate—did not amount to a pervasive atmosphere of hostility. And the rulings were not uniformly adverse to Franklin as the court also made rulings adverse to the prosecution. Franklin received the "fair trial in a fair tribunal" to which he was entitled under the Due Process Clause. *In re Murchison,* 349 U.S. at 136, 75 S.Ct. 623.

In his petition for review in the California Supreme Court, Franklin took issue with the Court of Appeal's denial of his many points of error:

> The Court of Appeal found that in each instance, the trial court acted within its proper authority. Again, the point has been missed; whether or not the trial court was arguably technically correct in its ruling, the sheer number and force of its numerous rulings against appellant indicates that the court had it in for appellant, was biased against him, and did everything possible to ensure that the jury returned a verdict against him.

Resp. Exh. B, Petition For Review, p. 9. This statement quite tellingly shows a complete misunderstanding of the role of the court. The trial court should do its best to grant and deny motions in accordance with the law, not to make the litigants feel more welcome in court. Taken to its absurd conclusion, petitioner's position appears to be that the court should have ruled in petitioner's favor on some motions, no matter how frivolous petitioner's position may have been, just to make petitioner feel that the court was not against him. If there were a hundred decisions to be made and petitioner was legally or factually wrong on every one of them, it would have been completely proper for the court to rule against petitioner a hundred

times. Indeed, had the court made decisions as though it was dividing up a pile of candy evenly between the two litigants— one for the prosecution, then one for the defense, and then repeating the pattern— there would have been a due process problem because the decisions would have made in an arbitrary manner rather than in an effort to be correct.

The California Court of Appeal's rejection of Franklin's "pervasive atmosphere of hostility" claim was not contrary to or an unreasonable application of clearly established federal law. Franklin is not entitled to the writ on this claim.

## B. *Ineffective Assistance of Appellate Counsel*

Franklin contends that his appellate counsel was ineffective in that she did not timely raise the issue of his trial counsel's ineffectiveness. Trial counsel allegedly was ineffective in that she did not investigate several defense witnesses and take appropriate steps to have those witnesses available to testify. In support of his petition, Franklin presents a declaration from his appellate counsel, Jo Anne Keller. Keller explained that she did not raise the ineffectiveness claim in her opening brief because she "did not see any ineffective assistance of trial counsel from [her] reading of the record." Petition, Exh. A., Declaration of Jo Anne Keller ("Keller Decl."), ¶ 3. She discovered the ineffectiveness issue when she read her opponent's brief:

> One issue I raised in the opening brief was that the trial court had erred in denying a defense motion for continuance to locate potential witnesses. (AOB 28–29) Respondent countered that the trial court had found lack of diligence in securing witnesses. (RB 23)[¶] In drafting a reply to respondent's brief, I realized that the response to the trial court's finding that the defense was not

diligent in securing witnesses was to argue that trial counsel was ineffective for not being diligent.

*Id.* at ¶¶ 4–5. The Court of Appeal refused to address the ineffectiveness issue because it was raised for the first time in the appellant's reply brief. Cal. Ct.App. Opinion, p. 18 n. 15; Keller Decl., ¶ 6. Attorney Keller believed that if she "had raised the ineffective assistance of counsel issue in the opening brief, the trial [sic] court would have addressed the merits of the issue." *Id.* at ¶ 7. She did *not* opine that Franklin would have prevailed on the merits had the issue been raised properly.[4]

■■■■■ The Due Process Clause guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Miller v. Keeney,* 882 F.2d 1428, 1433 (9th Cir.1989). Franklin therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. *Id.* at 1434 & n. 9 (citing *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052). The Constitution does not require appellate counsel to raise every colorable or non-frivolous claim; to the contrary, effective appellate advocacy involves weeding out weaker claims in order to focus on stronger ones. *Miller,* 882 F.2d at 1434.

Franklin's claim that appellate counsel was ineffective depends on a showing that he would have prevailed on the merits in the appellate court if his trial counsel's ineffectiveness had been argued on appeal. To prevail on an ineffective assistance of trial counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington,* 466 U.S. at 687–88, 104 S.Ct. 2052, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, *see id.* at 694, 104 S.Ct. 2052; *accord People v. Cunningham,* 25 Cal.4th 926, 1003, 108 Cal.Rptr.2d 291, 25 P.3d 519 (2001) (to show ineffectiveness under California law, defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings).

The starting point in the analysis is to look at trial counsel's allegedly improper actions. The witnesses not investigated and/or not called by Franklin's trial counsel were discussed by counsel when she unsuccessfully moved for a continuance during the middle of the defense presentation of evidence because some witnesses had not been investigated or were not available. Working through this list leads to the conclusion that the failure to investigate and/or call these witnesses to testify did not amount to ineffectiveness.

### 1. *Berkeley Police Officer Sabins*

The first desired witness was Berkeley police officer Sabins. Sabins had respond-

---

**4.** Although Keller did raise the ineffectiveness issue in her reply brief, the Court of Appeals refused to consider the claim because it was raised too late. The practical effect of this was the same as if the issue had never been raised. In the discussion that follows, the court will refer to the appellate counsel's actions as a failure to raise the issue on appeal for the sake of clarity even though the issue was raised belatedly.

ed to Darol Wallace's call to the police and had taken a report from Wallace on December 23, 1994. Defense counsel subpoenaed Sabins, but did not learn until the middle of the trial that Sabins was unavailable to testify because he was on vacation and would not return for about another week. Defense counsel wanted to use Sabins to impeach Wallace's testimony. She intended to show that Wallace's trial testimony that Franklin knocked on the door of the home and Wallace opened it was contradicted by his statement to Sabins (according to Sabins' report) that Franklin pushed the door open. This purportedly would show jurors that Wallace "exaggerated to the police about what happened on that point. And then they could conclude that he exaggerated and lied to the police about the crux of the matter, the 211." RT 620. Defense counsel also intended to show that Wallace's trial testimony that Franklin took $40–$41 out of one pocket and $23 out of another was contradicted by his statement to Sabins that Franklin took $41 from him. This would show inconsistencies in Wallace's recollection. Defense counsel also wanted to talk to Sabins to find out if there was more impeachment material.

■ There is no reasonable likelihood that having Sabins testify would have made any difference in light of the extremely damaging testimony Franklin gave at trial that all but admitted the robbery. Franklin testified to the following. He had entered the home and walked around several rooms looking for his personal property. Franklin hit Wallace and Wallace did not hit him, although Franklin stated that Wallace was the initial aggressor rather than vice-versa. While Wallace lay on the couch after being hit by Franklin, Franklin squeezed Wallace's throat and demanded to know where his property was. When Wallace said he did not know where the property was, Franklin grabbed money that was protruding halfway out of

Wallace's pockets. Franklin intended to keep that money. In light of these statements by Franklin, which were in very many respects corroborative of Wallace's version of the events, the proposed impeachment would have made no difference. Showing the small discrepancies that Wallace told police that Franklin had pushed open the door and that Wallace had told police that a different sum of money had been taken—especially when Franklin had admitted that he took some money from Wallace's pocket—simply would not have affected the jury's view of the incident. No prejudice resulted from not having officer Sabins testify to impeach Wallace. The court need not decide whether Franklin also failed to show whether it was deficient performance for counsel not to learn sooner that the officer she subpoenaed would not be available to testify because he was on vacation. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 (court need not determine whether counsel's performance was deficient before examining the prejudice prong; "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

2. *Witnesses Regarding Franklin's Martial Arts Skills*

Defense counsel wanted to call three witnesses regarding Franklin's martial arts skills. Mr. Woods could testify that Franklin had a black belt in Tae Kwon Do and was a physically powerful person. Defense counsel had learned Woods' work number on the Monday she requested the continuance and apparently learned of his identity after the start of the trial. Eli Jackson could testify that Franklin was his martial arts instructor, had a black belt in Tae Kwon Do and was a physically powerful person. Stephanie Taboe could testify that Franklin taught martial arts at Odys-

sey Junior High School during 1971–1974 and that she recalled a teacher named Ralph Cantor teaching at the same time at that school. Counsel had learned of Taboe on the eve of trial and had not yet been able to subpoena her. The trial court denied the continuance to get these witnesses in part because their testimony would be cumulative and in part because defense counsel had not been diligent in locating them.

■ These witnesses would have provided cumulative testimony on an undisputed point. Franklin testified that he was a martial arts expert and that he taught at Odyssey Junior High School in the early 1970s. Witness Zafirah Green also testified that Franklin and Cantor both taught at Odyssey Junior High School in the early 1970s. Witnesses Julius Baker and Beverly Ray testified about Franklin's martial arts skills. The prosecution never disputed that testimony or the characterization of Franklin as a martial arts expert. No prejudice resulted from not obtaining testimony from the uncalled witnesses.[5]

### 3. *The Barbershop Owner*

Defense counsel also wanted to call Bob Clog as a witness. He owned a barbershop and could testify that Franklin worked for him at the barbershop off and on during December 1994—January 1995. Franklin had provided this name to defense counsel over the weekend before the Monday on which the continuance was requested.

■ The failure to call Bob Clog to testify did not amount to deficient performance and did not result in any prejudice. Franklin testified that he worked on and off for the barbershop and received some money therefor to augment the money he received from General Assistance. Franklin made very little money from his sporadic work at the barbershop. And Franklin did not suggest that Clog could have provided any alibi for him. It was not deficient performance and no prejudice resulted from the failure to call as a witness this person who did not have any relevant and useful testimony.

### 4. *An Alleged Informant*

Defense counsel also wanted a continuance so she could try to locate a man who had briefly shared a cell with Franklin. The defense believed this man was an informant for inspector Wolke or others. Defense counsel had provided information to her investigator to subpoena the Berkeley jail records to find the man but the investigator was ill and never received or acted on counsel's instructions. Counsel stated that *"the possibility* is that this witness *could* say that in fact he was there as an agent of the Berkeley Police Department, or specifically officer Wolke, to learn about any information he could about the 1974 homicide." RT 623 (emphasis added). Counsel argued that such information would help show police bias against Franklin and inspector Wolke's suggestiveness in putting together the lineup. On the Thursday before the Monday on which she requested a continuance, defense counsel learned that the investigator had been out sick for a week and had not found the man. The prosecutor stated that he had no knowledge of any informant in this case; he thought defense counsel wanted to embark on a "wild goose chase." RT 625.

■ Defense counsel took steps to learn about this alleged informant by del-

---

5. Eli Jackson did testify later for the defense, as did another witness, Gina Davenport, who was unavailable on the day the continuance was requested. Because these witnesses did testify, there was no deficient performance or resulting prejudice with regard to counsel's failure to have them ready to testify earlier.

egating the task of locating the alleged informant to her investigator. Her investigator's illness prevented the desired investigation. This court need not decide whether counsel was deficient in not undertaking an investigation earlier, in not learning sooner that her investigator was ill, or in not taking alternative steps to learn the person's identity because Franklin has not shown any prejudice resulting from counsel's actions. Defense counsel did not have any independent information to show that the person was an informant; her theory was based on Franklin's hunch which was based on the man's appearance and actions in jail. Defense counsel thought the man was an informant as to the homicide and did not say he was an informant to the various crimes for which Franklin was being tried, although Franklin's theory was that the current charges were motivated by an improper animosity toward him due to the earlier homicide. There is no allegation that Franklin spoke to this alleged informant or gave him any information during the brief period they were cellmates while Franklin was in transit to the lineup. No prejudice resulted from counsel's inability to locate a person who defense only speculates *might* have been an informant, especially in light of the very significant physical evidence and victim testimony connecting Franklin to the crimes of which he was convicted. *See Bragg v. Galaza,* 242 F.3d 1082, 1087 (9th Cir.), *amended,* 253 F.3d 1150 (9th Cir. 2001) (defendant's mere speculation that witness might have given helpful information if interviewed is not enough to establish ineffective assistance). Even if the man was located and even if he was an informant for Wolke, there is no reasonable likelihood that the result of the proceedings would have been different. The case against Franklin was very strong: victims positively identified him, stolen property was found in his possession and Franklin had given very damaging testimony regarding the robbery of Wallace.

 As discussed above, Franklin has not shown that trial counsel provided ineffective assistance of counsel. There is no reasonable probability that there would have been a different result if any or all of these witnesses had been investigated and called to testify at his trial. It was not deficient performance by appellate counsel not to raise the non-meritorious issue.

There was even a benefit of omitting the argument on appeal. Making the ineffectiveness argument on appeal would have diluted another argument made on appeal. Franklin argued on appeal that the trial court's denial of his request for a continuance was one of several examples of the trial court's repeated denials of his reasonable requests. *See* Cal. Ct.App. opinion, p. 18. The continuance was requested to obtain the witnesses that Franklin claims counsel should have investigated and called. Arguing that his attorney performed incompetently in not investigating and having available those witnesses would have undercut Franklin's position that the court was unreasonable in denying the requested continuance to get those witnesses. By casting it as only unreasonable conduct by the trial court with no contributory negligence by defense counsel, appellate counsel was able to make a purer and stronger—although ultimately unsuccessful—argument.

 Franklin argues that the prejudice prong is satisfied by the fact that the court of appeal refused to consider the issue because it had not been raised in the opening brief. He misunderstands the law on this point. In order to show prejudice, Franklin must show that had counsel not engaged in deficient performance, there is a reasonable probability that the outcome on appeal would have been different. *See Miller v. Keeney,* 882 F.2d at 1434 & n. 9.

In other words, he would have to show that he would have prevailed on the merits of the omitted claim, not simply that the court would have reached the merits. He has not done so. Raising on appeal the issue of trial court's ineffectiveness might not have been patently frivolous but would not have led to a reasonable probability of a different outcome in the appeal. It was not ineffective assistance for appellate counsel not to include the ineffective assistance of trial counsel claim in her appeal. Franklin is not entitled to relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.